396 S.E.2d 709

Robert **BETTINGER**

v.

Marie Militzer **BETTINGER**.

No. 19382.

Supreme Court of Appeals of West Virginia.

July 17, 1990.

William J. Leon, Vorbach & Gianola, L.C., Morgantown, for Marie Militzer Bettinger.

Clark Frame, Wilson, Frame & Metheney, Morgantown, for Robert Bettinger.

MILLER, Justice:

This is an appeal from a final order of the Circuit Court of Monongalia County in a divorce case. Marie Militzer Bettinger asserts that the family law master and the circuit court made a number of errors in evaluating her husband's assets for equitable distribution purposes. Mrs. Bettinger contends that the trial court erred in attaching a value to Mr. Bettinger's interest in a professional corporation known as Western Pennsylvania Anesthesia Associates, Limited (WPAA). The controversy in this regard centers on the effect of a corporation stock buy-sell agreement, the fixing of a value for accounts receivable, and whether a potential tax liability should have been deducted.

Mrs. Bettinger also claims that her interest in her husband's pension and profit sharing plan with WPAA was undervalued. A similar claim is asserted as to her interest in a retirement benefits program, referred to as the Teachers Insurance and Annuity Association—College Retirement Equities Fund (TIAA–CREF), resulting from his employment with West Virginia University. Mrs. Bettinger asserts that both plans are "defined contribution" plans rather than "defined benefit" plans, and, as a result, there should have been no discounting to present day value.

Two final errors center on more traditional grounds, i.e., inadequate awards of alimony and child support and the refusal to award Mrs. Bettinger attorney's fees and expert witness fees.

I.

Robert Bettinger and Marie Militzer Bettinger were married in February, 1976, while he was completing his anesthesiology residency. At the time, Marie Bettinger was working as an occupational therapist. She ceased working at the end of 1976 when their first child was born. At the time of the divorce, Mrs. Bettinger was

forty-five years old, and the parties' two children were ten and twelve years of age.

In 1977, Mr. Bettinger became employed at the West Virginia University Medical Center as an associate professor. In October, 1983, he entered into an employment agreement with WPAA. He terminated his relationship at the Medical Center when he began full-time employment with WPAA in January, 1984.

In 1983, his last year of employment with the Medical Center, Mr. Bettinger earned $93,747. Following his employment at WPAA, he earned $113,657 in 1984; $164,947 in 1985; and $228,320 in 1986, the year of the separation. These wages do not include his contributions to the WPAA pension and profit sharing plan. Further facts will be developed as they bear upon the particular issue raised.

## II. VALUATION OF HUSBAND'S INTEREST IN PROFESSIONAL CORPORATION

Mr. Bettinger's interest in the professional corporation is a marital asset. The experts for the parties, while using different methods of calculation, do not widely disagree as to the net tangible assets of the corporation. Mr. Bettinger's expert gave a figure of $175,000 without any factor for the accounts receivable or goodwill. Mrs. Bettinger's expert gave a figure of $187,676, which included the accounts receivable,[1] but no goodwill.

### A. Accounts Receivable Valuation

The family law master refused to accept the net tangible asset figure of Mrs. Bettinger's expert because of the manner in which the expert had calculated the value of the accounts receivable. Her expert, who testified as to his familiarity with similar medical corporations, stated that customarily the accounts receivable of a medical corporation amount to approximately 40 percent of the annual gross receipts. In 1986, WPAA's gross receipts were $3,414,028. Forty percent of that figure would be $1,365,611. The expert deducted from the latter figure income taxes in the amount of $273,122, leaving a net after tax value of $1,092,489 for the accounts receivable. As there were seven equal shareholders in the corporation, Mr. Bettinger's share of the accounts receivable was set at one-seventh of this figure.

The family law master rejected this calculation and instead concluded, without offering any reason, that the value of the accounts receivable was only one-twelfth of the gross receipts of the corporation. The deferred taxes were then deducted from this lower figure.

As a preliminary matter, we note that part of the problem in determining the value of the accounts receivable was due to the fact that Mrs. Bettinger had been unable to compel disclosure of the financial records of the corporation. The only information made available were the corporate income tax returns which did not provide sufficient individualized accounting data. In the past, we have reversed cases on the ground that the failure to disclose relevant financial data makes a fair equitable distribution impossible. See Lambert v. Lambert, 180 W.Va. 317, 376 S.E.2d 331 (1988);[2] Hamstead v. Hamstead, 178 W.Va. 23, 357 S.E.2d 216, overruled on other grounds, Roig v. Roig, 178 W.Va. 781, 364 S.E.2d 794 (1987).

We decline to utilize this rule in a case such as this where a reliable expert is able to make reasonable assumptions based on expert knowledge. To permit one spouse

---

1. Mrs. Bettinger's accountant, in arriving at the net tangible assets, deducted the corporate liabilities and deferred income tax on the accounts receivable, thus, comporting with the net value concept in W.Va.Code, 48–2–1, et seq. See Tankersley v. Tankersley, 182 W.Va. 627, 390 S.E.2d 826 (1990).

2. The Syllabus of Lambert states:
 " 'W.Va.Code, 48–2–33 [1984], requires a full disclosure of one spouse's financial assets to the other spouse at the time of divorce, and contemplates a meaningful hearing on the subject of equitable distribution of property at which the spouse submitting financial data may be cross-examined concerning the nature, origin and amount of assets.' Syl., Hamstead v. Hamstead, [178] W.Va. [23], 357 S.E.2d 216 (1987), overruled on other grounds, Roig v. Roig, [178] W.Va. [781], 364 S.E.2d 794 (1987)."

to withhold relevant data and then utilize it as a basis for attacking the expert's opinion is to reward the nondisclosing party. Moreover, it enables such party to prolong the litigation needlessly.

■ Although we accord a measure of discretion to a family law master in making value determinations after hearing expert testimony, the family law master is not free to reject competent expert testimony which has not been rebutted. This statement is analogous to the rule that " '[w]hen the finding of a trial court in a case tried by it in lieu of a jury is against the preponderance of the evidence, is not supported by the evidence, or is plainly wrong, such finding will be reversed and set aside by this Court upon appellate review.' " Syllabus Point 1, in part, *George v. Godby*, 174 W.Va. 313, 325 S.E.2d 102 (1984), *quoting* Syllabus Point 4, *Smith v. Godby*, 154 W.Va. 190, 174 S.E.2d 165 (1970).[3]

■ Here, Mr. Bettinger's expert stated that he had not been asked to evaluate the accounts receivable. This was one of the primary assets of the corporation. The family law master offered no explanation as to why he rejected the testimony of Mrs. Bettinger's expert nor did he explain why his calculation of the accounts receivable was more realistic. We conclude that the family law master erred in this regard, as did the trial court in accepting the recommendation of the family law master.

**3.** This is analogous to a circuit court's review of a family law master's recommended decision as set out in W.Va.Code, 48A–4–10(c):

"The circuit court shall examine the recommended decision of the master, along with the findings and conclusions of the master, and may enter an order in conformance with the recommended decision, may recommit the case, with instructions, for further hearing before the master or may, in its discretion, enter an order upon different terms, as the ends of justice may require. The circuit court shall not follow the recommendation, findings, and conclusions of a master found to be:

"(1) Arbitrary, capricious, an abuse of discretion, or otherwise not in conformance with the law;

"(2) Contrary to constitutional right, power, privilege, or immunity;

Mr. Bettinger contends that the family law master and the circuit court failed to establish the value of his stock in WPAA on the basis of his buy-sell agreement with the corporation. This agreement set the price at $50 per share. Based on Mr. Bettinger's thirty-three shares, the total value would be $1,650. The family law master originally accepted this argument, but his ruling was reversed by the circuit court in its order of August 5, 1987. Thereafter, the family law master held an additional hearing and, in his recommended decision dated June 16, 1988, set the value of the stock at $274,552.50, which the court essentially approved by order of August 12, 1988.

Mr. Bettinger does not cross-assign error on the failure to use the buy-sell figure, as required by Rule 10(f) of the Rules of Appellate Procedure, West Virginia Supreme Court of Appeals.[4] The purpose of requiring a specific cross-assignment of error is to alert the appellant to the issue to enable a response to be made in the appellant's reply brief. Here, because no designation of cross-assignment of error was made, no reply brief was filed by Mrs. Bettinger.

■ Even if this error was not waived, a majority of courts which have considered a buy-sell agreement in a closely held corporation setting the stock value for equitable distribution purposes has determined that such agreement should not be considered

"(3) In excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

"(4) Without observance of procedure required by law;

"(5) Unsupported by substantial evidence; or

"(6) Unwarranted by the facts."

**4.** Rule 10(f) of the Appellate Rules states:

*"Cross Assignment of Error.*

Appellee, if he is of the opinion that there is error in the record to his prejudice, may assign such error in a separate portion of his brief and set out authority and argument in support thereof. Such cross assignment may be made notwithstanding the fact that appellee did not file a separate petition for an appeal within the statutory period for taking an appeal. Appellant may answer the cross assignment of error in his reply brief."

as binding, but rather should be weighed along with other factors in making a determination as to the value of such stock. *E.g., In re Marriage of Melnick,* 127 Ill. App.3d 102, 82 Ill.Dec. 228, 468 N.E.2d 490 (1984); *In Re Marriage of Moffatt,* 279 N.W.2d 15 (Iowa 1979); *Rogers v. Rogers,* 296 N.W.2d 849 (Minn.1980); *Bowen v. Bowen,* 96 N.J. 36, 473 A.2d 73 (1984); *Amodio v. Amodio,* 70 N.Y.2d 5, 516 N.Y. S.2d 923, 509 N.E.2d 936 (1987); *In the Matter of the Marriage of Belt,* 65 Or.App. 606, 672 P.2d 1205 (1983); *Bosserman v. Bosserman,* 9 Va. App. 1, 384 S.E.2d 104 (1989); *Arneson v. Arneson,* 120 Wis.2d 236, 355 N.W.2d 16 (Wis.App.1984). It is apparent that buy-sell agreements in a closely held corporation can be manipulated by the shareholders to reflect an artificially low value. This is why caution should be exercised in accepting their value for equitable distribution purposes.[5]

### B. *Discount for Federal Income Taxes on Wife's Share*

The family law master found that Mrs. Bettinger's share of Mr. Bettinger's interest in the professional corporation should be reduced by an amount for federal income taxes. This was based on the premise that if Mr. Bettinger sold his interest, he would be liable for a federal income tax. This conclusion was approved by the circuit court.

Mrs. Bettinger argues that there was no evidence that her husband intended or would be required to sell his interest in the corporation to meet his equitable distribution obligation. She points to the fact that under the circuit court's order, as more fully discussed in the next section, he is permitted to pay her valued share in equal monthly payments over a ten-year period.

■ Mrs. Bettinger points to both Section 1041 of the Internal Revenue Code,[6] 26 U.S.C. § 1041 (1984), and W.Va.Code, 48–2–32(i),[7] which specifically exempt from federal and state taxes transfers of property between spouses which arise incident to a divorce. Not many jurisdictions have had an occasion to specifically discuss this issue simply because it was not until 1984 that Congress enacted Section 1041, termed the Domestic Relations Tax Reform Act.[8] *See In re Marriage of Marron,* 170 Cal.App.3d 151, 158, 215 Cal.Rptr. 894, 900 (1985) ("[T]he Domestic Relations Tax Reform Act of 1984 ... provides no recognition of

---

5. Mr. Bettinger also argues that the goodwill factor in valuing the corporate stock was not proper, but again no cross-assignment of error is made. As a consequence, we decline to discuss this issue except to point out that courts have recognized that there may be a goodwill factor in a professional corporation if based on competent expert testimony. *See* Annot., 52 A.L.R.3d 1344 (1973).

6. The material portion of Section 1041 of the Internal Revenue Code, 26 U.S.C. § 1041 (1984), provided:

> "(a) **General rule.**—No gain or loss shall be recognized on a transfer of property from an individual to (or in trust for the benefit of)—
> "(h) a spouse, or
> "(2) a former spouse, but only if the transfer is incident to the divorce."

Subsequent amendments to the statement in 1986 and 1988 did not substantially alter this provision.

7. W.Va.Code, 48–2–32(i), states:

> "Notwithstanding the provisions of chapter eleven of this Code, no transfer of interest in or title to property under this section shall be taxable as a transfer of property without consideration nor, except as to alimony, create

liability for sales, use, inheritance and transfer, or income taxes due the State or any political subdivision nor require the payment of the excise tax imposed under article twenty-two [§ 11–22–1 et seq.] of said chapter eleven."

8. R. Hjorth in his article, *Divorce, Taxes, and the 1984 Tax Reform Act: An Inadequate Response To An Old Problem,* 61 Wash.L.Rev. 151, 152 (1986), describes some of the tax consequences prior to 1984 on property transfers between husband and wife incident to a divorce:

> "Cash payments made for vested property interests were taxable sales that could cause the selling spouse to recognize taxable gain, and part of such payments might constitute imputed interest under section 483. If property was not sold, but was simply transferred from one spouse to another pursuant to divorce, the spouse who made the transfer was deemed in *United States v. Davis* [370 U.S. 65, 82 S.Ct. 1190, 8 L.Ed.2d 335 (1962)] to have received consideration equal to the fair value of the property transferred. The 'consideration' was presumed to be a complete or partial discharge of obligations arising out of the marital relationship." (Footnotes omitted).

gain or loss, for tax purposes, on transfers of property between spouses incident to dissolution [of a marriage].").

■ While there is no tax liability attendant to a transfer between husband and wife, if a party to a divorce were required to sell an asset to a third party to satisfy an equitable distribution obligation, such a sale would give rise to a taxable incident. This tax question has been discussed in cases involving equitable distribution before the adoption of Section 1041. Courts have generally concluded that the tax implications of a future sale of property to a third party are too speculative to allow for a tax deduction against the other spouse's share unless it could be ascertained that under the court's decree, such sale would actually occur. *See, e.g., In re Marriage of Goldstein,* 120 Ariz. 23, 583 P.2d 1343 (1978); *Levan v. Levan,* 545 So.2d 892 (Fla. App.1989); *Burkhart v. Burkhart,* 169 Ind.App. 588, 349 N.E.2d 707 (1976); *Nemitz v. Nemitz,* 376 N.W.2d 243 (Minn.App. 1985); *In re Marriage of Beck,* 631 P.2d 282 (Mont.1981); *Orgler v. Orgler,* 237 N.J. Super. 342, 568 A.2d 67 (1989); *Hovis v. Hovis,* 518 Pa. 137, 541 A.2d 1378 (1988). The typical explanation for this rule is given in *Orgler v. Orgler,* 237 N.J.Super. at 355–56, 568 A.2d at 73–74, which states:

> "We adopt as sound the common theme found in each of these out-of-state cases, that hypothetical tax consequences upon the future sale or transfer of marital assets should not be deducted from present value for equitable distribution purposes. The hypothetical tax is simply too speculative to permit a reduction in value.

> \*　　\*　　\*　　\*　　\*　　\*

> "However, the tax consequences resulting from a court-ordered sale of marital assets, or of a contemporaneous sale of assets by an ex-spouse necessary to meet his or her equitable distribution obligation, is not speculative at all. In such a circumstance, the ex-spouse is able to demonstrate the present tax consequence. Further, distribution of the *net* value in such a circumstance best attains

an equitable distribution of the asset." (Emphasis in original; citations omitted).

There is no evidence in the record that Mr. Bettinger intended or was required to sell his stock interest in order to pay Mrs. Bettinger her proportionate share of its value. As we have already pointed out, payment of Mrs. Bettinger's interest is being made in monthly installments. Consequently, there was no basis for reducing her share by way of a purported tax liability.

## III. INSTALLMENT PAYMENT ON WIFE'S SHARE OF CORPORATE STOCK AND LACK OF INTEREST

The family law master ordered Mrs. Bettinger's share in her husband's stock to be paid in 120 equal monthly installments without interest. She argues that a lump sum payment should have been ordered or, at the very least, interest should have been ordered paid on the installments, citing *Cross v. Cross,* 178 W.Va. 563, 363 S.E.2d 449 (1987), as to this latter point. In *Cross,* we dealt with another type of marital asset, a husband's pension, and expressed a preference for a lump sum payment, but recognized in Syllabus Point 5 that other options were available:

> "When a court is required to divide vested pension rights that have not yet matured as an incident to the equitable distribution of marital property at divorce, the court should be guided in the selection of a method of division by the desirability of disentangling parties from one another as quickly and cleanly as possible. Consequently, a court should look to the following methods of dividing pension rights in this descending order of preference unless peculiar facts and circumstances dictate otherwise: (1) lump sum payment through a cash settlement or off-set from other available marital assets; (2) payment over time of the present value of the pension rights at the time of divorce to the non-working spouse; (3) a court order requiring that the non-working spouse share in the benefits on a proportional basis when and if they mature."

Here, Mrs. Bettinger appears to recognize that Mr. Bettinger has no readily available cash or other asset to offset for her interest in the corporation. She maintains that Mr. Bettinger could borrow sufficient funds to pay the amount owed. We note initially that W.Va.Code, 48-2-32(d)(7)(A) through (E), contain a variety of options that are available to the trial court to provide for payment of a party's equitable distribution share.[9] Of more immediate interest is the language of W.Va.Code, 48-2-32(e), that gives "preference to effecting equitable distribution through periodic or lump sum payments[.]" However, this preference does not apply to a transfer of title to motor vehicles, household goods, and the former marital domicile.[10]

■ While it is advantageous to have the parties disentangle their equitable distribution obligations expeditiously, as we indicated in *Cross*, this is not a mandatory requirement. Where there are substantial nonliquid assets that are subject to equitable distribution, there may be no other recourse than for a trial court to order installment payments for a spouse's share. Here, Mr. Bettinger's stock and pension and profit sharing plans had no liquidity and constituted sizeable obligations. Consequently, we conclude that the circuit court did not abuse its discretion in ordering periodic payments on the equitable distribution asset involving his stock.

■ However, we agree with Mrs. Bettinger's alternative claim that she be given interest on the unpaid balance. We recognized in *Cross* that where monthly payments were made on a wife's share of her husband's pension, she should get "interest over [the] term of years" that it was payable. 178 W.Va. at 569, 363 S.E.2d at 455. Other courts have recognized that where the value of an equitable distribution asset is payable over a term of years, interest should be paid at the going rate in the absence of some special hardship factor shown by the obligor.[11] *In re Marriage of Conley*, 284 N.W.2d 220 (Iowa 1979); *In re Marriage of Paul*, 704 S.W.2d 278 (Mo. App.1986); *Collier v. Collier*, 36 Ohio App.3d 130, 521 N.E.2d 849 (1987); *In Matter of the Marriage of Haguewood*, 292 Or. 197, 638 P.2d 1135 (1981); *Lien v. Lien*, 278 N.W.2d 436 (S.D.1979); *Ovens v. Ovens*, 61 Wash.2d 6, 376 P.2d 839 (1962); *Corliss v. Corliss*, 107 Wis.2d 338, 320 N.W.2d 219 (1982). In *Lien*, the South Dakota Supreme Court gave this explanation of the rule:

"Each party is entitled to their respective property as of [the judgment] date. It

---

9. W.Va.Code, 48-2-32(d)(7)(A) through (E) provide, in part:

"(7) ... To make such equitable distribution, the court may:

"(A) Direct either party to transfer their interest in specific property to the other party;

"(B) Permit either party to purchase from the other party their interest in specific property;

"(C) Direct either party to pay a sum of money to the other party in lieu of transferring specific property or an interest therein, if necessary to adjust the equities and rights of the parties, which sum may be paid in installments or otherwise, as the court may direct;

"(D) Direct a party to transfer his or her property to the other party in substitution for property of the other party of equal value which the transferor is permitted to retain and assume ownership of;

"(E) Order a sale of specific property and an appropriate division of the net proceeds of such sale: Provided, That such sale may be by private sale, or through an agent, or by judicial sale, whichever would facilitate a sale within a reasonable time at a fair price."

10. The applicable language of W.Va.Code, 48-2-32(e), is:

"In order to achieve the equitable distribution of marital property, the court shall, unless the parties otherwise agree, order, when necessary, the transfer of legal title to any property of the parties, giving preference to effecting equitable distribution through periodic or lump sum payments: Provided, That the court may order the transfer of legal title to motor vehicles, household goods and the former marital domicile without regard to such preference where the court determines it to be necessary or convenient."

11. Courts have recognized that it may be appropriate in special circumstances not to award interest or to award it at a lower rate, for example, where the obligor has low income or other financial hardship. If this is done, however, the trial court is required to give its reasons. *E.g., Lien v. Lien*, 278 N.W.2d 436 (S.D. 1979); *Corliss v. Corliss*, 107 Wis.2d 338, 320 N.W.2d 219 (1982).

follows as a necessary corollary that if for the convenience of the husband he is permitted to make a property division by paying his wife her share of the marital property in cash in installments that as a general rule any deferred payments should bear interest at the going rate; otherwise, the wife is not actually receiving the property division to which the court has determined she is entitled." 278 N.W.2d at 444.

There were no special circumstances shown in this case to warrant not awarding interest on the deferred payments. Interest should be awarded on remand.

## IV. VALUATION OF HUSBAND'S PENSION FUNDS

There does not appear to be any dispute that Mr. Bettinger's pension plan in the TIAA–CREF was a defined contribution plan. This type of plan consists of making periodic contributions to a fund by the employee, the employer, or both. This money is invested and each employee's account is credited with the contribution made plus the earnings made on the contributions. Retirement benefits are paid based on the accumulated contributions and earnings in the employee's account. This arrangement is analogous to a savings account except there is no automatic right of withdrawal before retirement.[12] *See Johnson v. Johnson*, 131 Ariz. 38, 638 P.2d 705 (1981).[13]

In this case, the value of Mr. Bettinger's account on the date of separation was $127,793.51, representing the contributions and the earnings thereon to that date. His pension account was vested, i.e., he had met the minimum number of years of employment so that his retirement account is preserved even though he cannot receive it until he reaches retirement age.[14] *In re Marriage of Hunt*, 78 Ill.App.3d 653, 34 Ill.Dec. 55, 397 N.E.2d 511 (1979); L. Golden, *Equitable Distribution of Property* § 6.10 (1983).

■ Most courts hold that the valuation for equitable distribution purposes of a vested defined contribution plan is the present actual value of the contributions made and the accumulated earnings thereon.[15] These courts have also concluded that there is no need to discount this value because it represents the actual present value. *E.g., Johnson v. Johnson, supra; Berry v. Board of Retirement of Los Angeles County Retirement Ass'n*, 23 Cal. App.3d 757, 100 Cal.Rptr. 549 (1972); *Duncan v. Duncan*, 724 S.W.2d 231 (Ky.App. 1987); *Laffitte v. Laffitte*, 232 So.2d 92 (La.App.1970); *In re Matter of Marriage of Richardson*, 307 Or. 370, 769 P.2d 179 (1989); *Bloomer v. Bloomer*, 84 Wis.2d 124, 267 N.W.2d 235 (1978). The Arizona Supreme Court in *Johnson*, 131 Ariz. at 43, 638 P.2d at 710, explained why the discount was inappropriate on a defined contribution plan:[16] "The trial court incorrectly discounted the value of the fund because no consideration was given to the fact that the fund was earning interest and would continue to earn interest. There was no need to discount the value of the account because the value of a defined contribution plan, such as that of appellee, is the

**12.** Some plans will permit the employee to withdraw his contributions if he terminates his employment before retirement.

**13.** Another basic type of pension plan is a defined benefit plan where the payments made on retirement are not tied to the contributions made and earnings thereon, but are keyed to a stated benefit level at retirement based on a percentage of salary and years of service. *See Johnson v. Johnson, supra; In re Matter of Marriage of Richardson*, 307 Or. 370, 769 P.2d 179 (1989).

**14.** Mr. Bettinger's pension fund was not matured. A pension fund is deemed matured when the employee has an immediate right to receive pension benefits. L. Golden, *Equitable Distribution of Property* § 6.10 (1983).

**15.** This assumes that there would be no forfeiture of benefits if the employee died prior to retirement.

**16.** In a defined contribution plan, benefits are based not on contributions paid in, but on what will have been paid in on the retirement date. These benefits are calculated on a percentage of salary plus years of service and represent the annual pension which will be received on retirement. This is a future figure that must be projected over the retirement life and then reduced to present day value.

present amount credited to the account."[17]

■ It would appear from the parties' briefs that Mr. Bettinger's pension and profit sharing plan in the professional corporation was also a vested defined contribution plan and had a $92,249 present value. His expert had discounted both pension amounts by 29 percent. This discount was apparently based on his view that since the funds could not be paid until Mr. Bettinger's retirement in the year 2012, a discount to present day value was appropriate.

The fallacy in this position is that the expert used the present day values as if they would be the value of the funds on the retirement date. The expert's position ignored the fact that the present values would continue to increase through contributions and earnings to the year 2012 when Mr. Bettinger would be sixty-five. If he had taken these latter figures, then a dis-count to present day value would have been appropriate.

We find that the trial court erred in discounting the present value of the pension and profit sharing plans. Upon remand, Mrs. Bettinger would be entitled to one-half of the present values of $127,-793.51 and $92,249.

## V. CHILD SUPPORT AND ALIMONY

### A. *Child Support*

■ Mrs. Bettinger argues that the child support award of $2,000 for her two children is not adequate and does not follow the child support guidelines established in our Code of State Rules. *Guidelines for Child Support Awards*, 6 W.Va. C.S.R. § 78–16–1, *et seq.* These rules were promulgated by the director of the Child Advocate Office pursuant to authority delegated by the legislature in W.Va.Code, 48A–2–8(a) (1986).[18] In *Holley v. Holley*, 181

---

17. In 1985, under the Retirement Equity Act of 1984, 29 U.S.C. § 1056(d)(3) (1986); I.R.C. § 414, employee spouses may assign their retirement benefits to nonemployee spouses or dependents under a qualified domestic relations order (QDRO). D. Wright in *Valuing Pensions Within Marriage Dissolution Actions: A Call For A Standard Presumption of Retirement Age,* 9 Hamline L.Rev. 431, 442 (1986), in dealing with pension valuations, makes this summary as to the advantages gained under the Retirement Equity Act:

"However, benefit assignment under the statutory scheme has an advantage over the traditional reserved jurisdiction method because the nonemployee spouse may elect to receive his or her share of the benefits when they first become available to the employee spouse even though the employee spouse does not actually retire. The advantage to the employee spouse is that the payments awarded to the nonemployee spouse are made directly from the plan to the nonemployee spouse who is taxed on those payments in the same manner as the employee spouse would have been taxed. Since the payouts are made from the plan itself rather than by the employee spouse, this method of division retains the advantage of the present cash value method of division because it eliminates the need for continuing involvement between the two spouses. It also retains the advantages of the reserved jurisdiction method of making it unnecessary to determine the present value and distributing the risk equally between the parties." (Footnotes omitted).

18. W.Va.Code, 48A–2–8(a) (1986), the statute in effect at the time of the hearing in this case, provided:

"On or before the first day of October, one thousand nine hundred eighty-seven, the director of the child advocate office shall, by legislative rule, establish guidelines for child support award amounts so as to ensure greater uniformity by those persons who make child support recommendations and enter child support orders, and to increase predictability for parents, children and other persons who are directly affected by child support orders. Such guidelines shall be followed by the children's advocate, the family law master and the circuit court unless, in each instance, the advocate, master or judge sets forth, in writing, reasons for not following the guidelines in the particular case involved. Notwithstanding the existence of such guidelines, individual cases will still be considered on their own merits."

In 1989, this section was amended, primarily in the second and third sentences which now read: "There shall be a rebuttable presumption, in any proceeding before a family law master or circuit court judge for the award of child support, that the amount of the award which would result from the application of such guidelines is the correct amount of child support to be awarded. A written finding or specific finding on the record that the application of the guidelines would be unjust or inappropriate in a particular case shall be sufficient to rebut the presumption in that case."

W.Va. 396, 382 S.E.2d 590 (1989), we spoke to the necessity of following the guidelines and stated in the Syllabus:

> "When a family law master or a circuit court enters an order awarding or modifying child support, the amount of the child support shall be in accordance with the established state guidelines, set forth in 6 *W.Va.Code of State Rules* §§ 78-16-1 to 78-16-20 (1988), unless the master or the court sets forth, in writing, specific reasons for not following the guidelines in the particular case involved. *W.Va.Code*, 48A-2-8(a), as amended."

*Holley* involved a situation where the court had increased the child support to $270 per month, but under the guidelines, Mrs. Holley was entitled to $529.07 per month. We concluded that the trial court erred in not following the formula and in failing to comply with the statutory requirement that if the guidelines were not followed to set forth "in writing, specific reasons for not following the guidelines in the particular case involved. *W.Va.Code*, 48A-2-8(a), as amended." 181 W.Va. at 399, 382 S.E.2d at 593.

In the present case, the claim is made that with Mr. Bettinger's net income at approximately $150,000 per year, the formula would have yielded child support of $3,524 per month, even with allocation of attributed income to Mrs. Bettinger.[19]

 Mr. Bettinger argues that the formula is not to be used in this case and

points to 6 W.Va. C.S.R. § 78-16-2.7.2, which provides:[20]

> "If the discretionary income of either support obligor exceeds six thousand dollars per month, or if the combined discretionary income of both support obligors exceeds eight thousand dollars per month, the court or master may not apply the percentages set forth in this section. Under such circumstances, the court shall equitably determine the SOLA support obligation so as to avoid a windfall to either support obligor or a hardship on either support obligor, and shall be cognizant of the fact that an excessive amount of SOLA support may not be in the best interests of the child or children."

The term "SOLA" means the "standard of living adjustment." 6 W.Va. C.S.R. § 78-16-2.6. Under the child support formula, there are two calculations for child support. The first calculation is to determine the primary child support, which essentially covers the basic needs of the children. The SOLA calculation is then made based on defined percentages for the number of children.

We do not read this section to mandate an absolute bar to use of the formula. We note initially that the language is "the court or master may not apply the percentages set forth in this section." Ordinarily, the word "may" imparts discretionary action, while the term "shall" indicates a mandatory requirement. *See* Syllabus

---

Moreover, the 1989 amendment created additional qualifications that we summarized in note 4 of *Holley v. Holley*, 181 W.Va. 396, 398, 382 S.E.2d 590, 592 (1989):

> "*W.Va.Code*, 48A-2-8(a) now states that the guidelines shall not be followed (1) when the parties have knowingly and intelligently waived the child support award amount under the guidelines after disclosure of that amount, and the parties have agreed on another amount, or (2) when the amount of the child support award under the guidelines would be contrary to the best interests of the child(ren) or of the parties."

19. Under 6 W.Va. C.S.R. § 78-16-4.1 "attributed income" is defined:

> "The term 'attributed income' shall mean income not actually earned by a support obli-

gor, but which may be attributed to such support obligor because he or she is unemployed, is not working full time, or is working below full earning capacity."

This section discusses at some length detailed rules surrounding "attributed income," and its purpose is to recognize that child support is an obligation of both parents. Consequently, certain income can be attributed to a nonworking spouse if the record shows that these guidelines are met. The support obligation of the other spouse may be reduced accordingly under the child support formula.

20. Although the divorce was filed in 1986, the child support issue was not considered until 1988, and the parties used the child support guidelines in effect at that time.

Point 4, *Woodring v. Whyte*, 161 W.Va. 262, 242 S.E.2d 238 (1978).

Second, the reference is to the SOLA part of the formula since this is the area where percentages are used. Under 6 W.Va. C.S.R. § 78–16–2.7, these percentages are based on the number of children:

"First child 15%
"Second and third child 10% each
"Fourth, fifth, and sixth child 5% each"

As we have earlier noted, the child support formula first calculates the primary support obligation based on the actual needs of the children.[21] The SOLA calculation is the second part of the formula and is computed based on the remaining income of the parents after deduction of parental self-support and the primary child support. Nothing in 6 W.Va. C.S.R. § 78–16–2.7.2 authorizes the family law master or circuit court to abandon the primary support obligation calculation regardless of the amount of discretionary income that the parties may have.

Indeed, the use of the term "discretionary income" in this section clearly indicates that the primary support obligation has been calculated. The term "discretionary income" under 6 W.Va. C.S.R. § 78–16–2.6 is the amount remaining "to a support obligor after he or she has met the obligor's self-support needs and primary support obligation."[22] It is this discretionary income, as we pointed out earlier, upon which the SOLA percentages are calculated.

It seems clear that 6 W.Va. C.S.R. § 78–16–2.7.2 of the child support guidelines allows a family law master or circuit court, in the exercise of sound discretion, to apply less than the full SOLA percentages for child support if one support obligor has a discretionary income above $6,000 a month or both support obligors have a combined discretionary income of $8,000 per month.

A decision not to follow the SOLA percentages must be undertaken in light of the legislative preference in W.Va.Code, 48A–2–8(b) (1989), which is that child support should be keyed to "the level of living which such children would enjoy if they were living in a household with both parents present."[23] If the family law master or circuit court determines that SOLA per-

---

21. 6 W.Va. C.S.R. § 78–16–2.4 defines the primary child support calculation:

"Determination of the total primary child support need.—The court or master shall establish the primary support need of each child for whom child support is sought and then total these amounts. The court or master shall add to the primary support needs of all the children in question the cost of extraordinary medical expenses and the cost of child care needed to allow a custodial parent to work, unless such expenses or costs have been deducted from income. Other expenses incurred because of the special needs of a child may be allowed if found by the court or master to be necessary. The court or master shall deduct from the primary support needs of a child the unearned income of such child. The amount resulting from these calculations shall be the 'total primary child support need.' "

22. The full text of 6 W.Va. C.S.R. § 78–16–2.6 is:

"Determination of the available net income for SOLA support.—The standard of living adjustment (SOLA) is designed to apportion the discretionary income available to a support obligor after he or she has met the obligor's self-support needs and primary support obligation. From the net income available for primary child support, as calculated in accordance with subdivision 2.3, determine the amount of discretionary income available ('available net income for SOLA support'), if any, by subtracting the following[.]"

23. The text of W.Va.Code, 48A–2–8(b), is:

"The Legislature, by the enactment of this article, recognizes that children have a right to share in their natural parents' level of living. Accordingly, guidelines promulgated under the provisions of this section shall not be based upon any schedule of minimum costs for rearing children based upon subsistence level amounts set forth by various agencies of government. The Legislature recognizes that expenditures in families are not made in accordance with subsistence level standards, but are rather made in proportion to household income, and as parental incomes increase or decrease, the actual dollar expenditures for children also increase or decrease correspondingly. In order to ensure that children properly share in their parents' resources, regardless of family structure, the guidelines shall be structured so as to provide that after a consideration of respective parental incomes, that child support will be related, to the extent practicable, to the level of living which such children would enjoy if they were living in a household with both parents present."

This language has existed since W.Va.Code 48A–2–8, was first enacted in 1986.

centages under 6 W.Va. C.S.R. § 78–16–2.7.2 should not be used, an explanation must be given.

■ In this case, there is nothing in the record to show how the $2,000 per month child support award was determined. As we have earlier pointed out, the primary child support obligation amount must be calculated first. Then, the application of the SOLA calculations under 6 W.Va. C.S.R. § 78–16–2.7.2 must be considered. In view of the absence of an appropriate factual record on the child support calculation, we remand for an appropriate calculation under the principles set out herein.

### B. *Alimony Award*

■ Mrs. Bettinger's complaint as to the $2,000 alimony award is twofold. First, she believes it is inadequate in view of her husband's income. Second, she also asserts that an award for only five years is akin to an award of rehabilitative alimony and that there was no showing that she met the criteria of *Molnar v. Molnar,* 173 W.Va. 200, 314 S.E.2d 73 (1984).

Again, we are faced with a record that fails to set out the reasons that alimony was granted in this amount and in this form. In W.Va.Code, 48–2–16(b) (1984), the legislature set forth a number of factors that should be considered in making an award of alimony.[24] None of these factors were alluded to by the family law master in his recommended decision.[25]

Furthermore, with regard to the sixty-month limitation, we made it clear in Sylla-

---

**24.** W.Va.Code, 48–2–16(b), provides:

"In cases where the parties to an action commenced under the provisions of this article have not executed a separation agreement, or have executed an agreement which is incomplete or insufficient to resolve the outstanding issues between the parties, or where the court finds the separation agreement of the parties not to be fair and reasonable or clear and unambiguous, the court shall proceed to resolve the issues outstanding between the parties. The court shall consider the following factors in determining the amount of alimony, child support or separate maintenance, if any, to be ordered under the provisions of *sections thirteen and fifteen* [§§ 48–2–13 and 48–2–15] of this article, as a supplement to or in lieu of the separation agreement:

"(1) The length of time the parties were married;

"(2) The period of time during the marriage when the parties actually lived together as husband and wife;

"(3) The present employment income and other recurring earnings of each party from any source;

"(4) The income-earning abilities of each of the parties, based upon such factors as educational background, training, employment skills, work experience, length of absence from the job market and custodial responsibilities for children;

"(5) The distribution of marital property to be made under the terms of a separation agreement or by the court under the provisions of section thirty-two [§ 48–2–32] of this article, insofar as the distribution affects or will affect the earnings of the parties and their ability to pay or their need to receive alimony, child support or separate maintenance;

"(6) The ages and the physical, mental and emotional condition of each party;

"(7) The educational qualifications of each party;

"(8) The likelihood that the party seeking alimony, child support or separate maintenance can substantially increase his or her income-earning abilities within a reasonable time by acquiring additional education or training;

"(9) The anticipated expense of obtaining the education and training described in subdivision (8) above;

"(10) The costs of educating minor children;

"(11) The costs of providing health care for each of the parties and their minor children;

"(12) The tax consequences to each party;

"(13) The extent to which it would be inappropriate for a party, because said party will be the custodian of a minor child or children, to seek employment outside the home;

"(14) The financial need of each party;

"(15) The legal obligations of each party to support himself or herself and to support any other person; and

"(16) Such other factors as the court deems necessary or appropriate to consider in order to arrive at a fair and equitable grant of alimony, child support or separate maintenance."

**25.** The entire text of the law master's recommended decision relating to alimony was: "Robert Bettinger shall pay to Marie Bettinger, alimony in the sum of $2,000.00 per month for a period not to exceed sixty (60) consecutive months. The Law Master recommends that Plaintiff be permitted a deduction for all alimony so paid for federal and state income tax purposes."

bus Point 3 of *Molnar v. Molnar, supra,* that a broad inquiry must be made:

> "There are three broad inquiries that need to be considered in regard to rehabilitative alimony: (1) whether in view of the length of the marriage and the age, health, and skills of the dependent spouse, it should be granted; (2) if it is feasible, then the amount and duration of rehabilitative alimony must be determined; and (3) consideration should be given to continuing jurisdiction to reconsider the amount and duration of rehabilitative alimony."

*See also Queen v. Queen,* 180 W.Va. 121, 375 S.E.2d 592 (1988); *Gorby v. Gorby,* 180 W.Va. 60, 375 S.E.2d 424 (1988); *Butcher v. Butcher,* 178 W.Va. 33, 357 S.E.2d 226 (1987); *Cross v. Cross,* 178 W.Va. 563, 363 S.E.2d 449 (1987).

We find no detailed inquiry in the record with regard to Mrs. Bettinger's ability to engage in remunerative work. She was forty-five years of age at the time of the divorce proceedings and had not worked for ten years at her former profession as an occupational therapist. Moreover, as we pointed out in *Molnar,* some courts are reluctant to give rehabilitative alimony where "there are minor children." 173 W.Va. at 204–205, 314 S.E.2d at 78. (Citations omitted). While rehabilitative alimony may be ideally suited to a young spouse, it is less suited to an older person who may find his or her age a limitation in a skilled job market.

In summary, we find the record inadequate to justify the alimony award and remand this matter for reconsideration under the foregoing guidelines.

## VI. ATTORNEY'S FEES AND EXPERT WITNESS FEES

Mrs. Bettinger's final claim is that she should be entitled to attorney's fees in excess of the $4,334.43 awarded in the family law master's order of November 4, 1987. We are not advised as to the amount of additional attorney's fees sought. However, it is clear that a considerable amount of legal work was done after November 4, 1987. The circuit judge had, on August 5, 1987, reversed the original recommended decision of the family law master. This required additional discovery and hearings, culminating in a new recommended decision on June 16, 1988. This decision was subsequently appealed to the circuit court and confirmed on August 12, 1988.

W.Va.Code, 48–2–13(a)(4) (1986), enables a court, which would include a family law master,[26] to "compel either party to pay attorney's fees and court costs reasonably necessary ... to prosecute or defend the action in the trial court." Moreover, this same section indicates that even though a party may be receiving "temporary alimony [this] shall not be decisive of that party's right to a reasonable allowance of attorney's fees and court costs." Finally, this section permits the court to order payment of "attorney's fees and costs on appeal."[27]

---

26. W.Va.Code, 48A–4–3(b), relating to the family law master, states:

"A master who presides at a hearing under the provisions of section two [§ 48A–4–2] of this article is authorized to make and enter pendente lite support and custody orders which, when entered, shall be enforceable and have the same force and effect under law as pendente lite support orders made and entered by a judge of the circuit court, unless and until such support orders are modified, vacated, or superseded by an order of the circuit court."

27. The text of W.Va.Code, 48–2–13(a)(4), is:

"The court may compel either party to pay attorney's fees and court costs reasonably necessary to enable the other party to prosecute or defend the action in the trial court. The question of whether or not a party is entitled to temporary alimony shall not be decisive of that party's right to a reasonable allowance of attorney's fees and court costs. An order for temporary relief awarding attorney fees and court costs may be modified at any time during the pendency of the action, as the exigencies of the case or equity and justice may require, including, but not limited to, a modification which would require full or partial repayment of fees and costs by a party to the action to whom or on whose behalf payment of such fees and costs was previously ordered. If an appeal be taken or an intention to appeal be stated, the court may further order either party to pay attorney fees and costs on appeal."

The record does not contain an order for temporary alimony. It would appear from Mrs. Bettinger's exceptions to the family law master's decision of December 14, 1988, that there had been no formal order for the payment of temporary alimony *pendente lite.* Despite assertions in Mr. Bettinger's brief that his wife had prolonged the litigation and made onerous discovery motions, we do not find the record to bear this out.

It is true that Mrs. Bettinger's attorney felt that the original recommended decision of the family law master was erroneous and was successful in having it reversed. Equally true is the fact that he complained about the final recommended decision which was approved by the trial court. We have, by this opinion, found his appeal to be substantially justified.

The purpose of W.Va.Code, 48–2–13(a)(4), is to enable a spouse who does not have financial resources to obtain reimbursement for costs and attorney's fees during the course of the litigation. It is unreasonable to expect an attorney to shoulder not only the cost of the litigation, but to conduct the litigation on a no-fee basis unless the client can pay or until it is ended and some fee is awarded. Here, Mrs. Bettinger was not working, and Mr. Bettinger was earning a sizeable income. The request by Mrs. Bettinger's attorney for additional fees should have been granted. Moreover, since Mrs. Bettinger has prevailed on this appeal, her attorney is entitled to fees and costs for his appellate work.

We have in past domestic cases stated that where attorney's fees are sought, the amount of the fees should be determined by utilizing those applicable factors set out in Syllabus Point 4 of *Aetna Casualty & Surety Co. v. Pitrolo,* 176 W.Va. 190, 342 S.E.2d 156 (1986).[28] *See, e.g., Jones v. Jones,* 176 W.Va. 438, 345 S.E.2d 313 (1986); *Burger v. Burger,* 176 W.Va. 416, 345 S.E.2d 18 (1986). Moreover, as we pointed out in *Nagy v. Oakley,* 172 W.Va. 569, 309 S.E.2d 68 (1983), the fact that the husband was the plaintiff in the divorce action does not foreclose requiring him to pay his wife's attorney's fees as this is "a perfectly logical extension of the traditional dependence of wives upon their husbands for support." 172 W.Va. at 572, 309 S.E.2d at 71. (Citations omitted). We also observe that in this case the basis for the divorce was one of no fault, i.e., irreconcilable differences.

There is included within W.Va.Code, 48–2–13(a)(4), the right to modify attorney's fees already ordered, which modification may "require full or partial repayment of fees and costs" previously ordered.[29] This provision is designed to permit the family law master or the circuit court to require repayment of attorney's fees previously awarded where the spouse who received the prior fee award obtains substantial alimony or other income-producing assets as a result of the divorce proceedings. Ordinarily, before such a modification is appropriate, the court should look to the income of the spouses at the time of the final decree. Unless the income of the spouse who received court-ordered attorney's fees

28. Syllabus Point 4 of *Aetna Casualty & Surety Co. v. Pitrolo, supra,* provides:
 "Where attorney's fees are sought against a third party, the test of what should be considered a reasonable fee is determined not solely by the fee arrangement between the attorney and his client. The reasonableness of attorney's fees is generally based on broader factors such as: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases."
 Rule 1.5(d)(1) of the Rules of Professional Conduct provides:
 "(d) A lawyer shall not enter into an arrangement for, charge, or collect:
 (1) any fee in a domestic relations matter, the payment or amount of which is contingent upon the securing of a divorce or upon the amount of alimony or support, or property settlement in lieu thereof."

29. For the full text of W.Va.Code, 48–2–13(a)(4), see note 27, *supra.*

is substantial when compared to the other spouse's income, modification would be inappropriate. Other courts have arrived at much the same conclusion. *See Weiman v. Weiman,* 188 Conn. 232, 449 A.2d 151 (1982); *Tydings v. Tydings,* 567 A.2d 886 (D.C.App.1989); *Peak v. Peak,* 411 So.2d 325 (Fla.App.1982); *Lavene v. Lavene,* 148 N.J.Super. 267, 372 A.2d 629, *cert. denied,* 75 N.J. 28, 379 A.2d 259 (1977).

Mrs. Bettinger's claim for reimbursement of a reasonable fee for her expert witness was rejected. This was error. There is little doubt that in valuing interest in pension and profit sharing plans or the value of a business or property which have been found to be marital assets, expert witnesses are needed. We have noted their presence in the following cases. *E.g., Tankersley v. Tankersley, supra; Shank v. Shank,* 182 W.Va. 271, 387 S.E.2d 325 (1989).

■■■ Where one spouse has an adequate income and the other spouse has no adequate income to retain an expert witness to assist in valuing property subject to equitable distribution, it is apparent that the impecunious spouse is at a substantial disadvantage. We believe that the analogy to awarding attorney's fees is appropriate. Consequently, we find that reimbursement for reasonable expert witness fees is permissible under similar financial considerations as those used in awarding attorney's fees. *See In re Marriage of Munguia,* 146 Cal.App.3d 853, 195 Cal.Rptr. 199 (1983); *F. v. F.,* 358 A.2d 714 (Del.1976); *Bagan v. Bagan,* 382 N.W.2d 645 (N.D.1986).

### VII.

For the foregoing reasons, the judgment of the Circuit Court of Monongalia County is reversed, and this case is remanded for further proceedings consistent with the principles outlined herein.

Reversed and remanded.