403 S.E.2d 761

**Mary Nelle WOOD, Plaintiff Below, Appellant,**

v.

**Craig Herbert WOOD, Jr., Defendant Below, Appellee.**

**Mary Nelle WOOD, Plaintiff Below, Appellee,**

v.

**Craig Herbert WOOD, Jr., Defendant Below, Appellant.**

**Nos. 19668, 19677.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 8, 1991.

Decided March 28, 1991.

W. Dean DeLaMater, DeLaMater, Hagg & Bohach, Fred Risovich, II, Weirton, for Mary Nelle Wood.

Frank Cuomo, Jr., Wellsburg, for Craig Herbert Wood, Jr.

PER CURIAM:

Both Mary Nelle Wood and her former husband, Craig Herbert Wood, Jr., appeal the final order of the Circuit Court of Hancock County that granted the parties a divorce on the grounds of irreconcilable differences, distributed property and awarded child support. On appeal, Mrs. Wood contends that the circuit court failed to award child support in accordance with the child support guidelines and failed to classify and evaluate certain property properly. Mr. Wood appeals the circuit court's unequal marital property distribution and award of attorneys' fees. In light of our recent holdings in *Whiting v. Whiting*, 183 W.Va. 451, 396 S.E.2d 413 (1990) and *Gardner v. Gardner*, 184 W.Va. 260, 400 S.E.2d 268 (1990), we reverse the circuit court and remand the case.

After seventeen years of marriage, Mr. and Mrs. Wood separated on March 1, 1988 and divorced on August 30, 1989, on the grounds of irreconcilable differences.[1] During the early course of the marriage Mrs. Wood taught school but, after the birth of their first child in 1976, she became a full-time homemaker while Mr. Wood continued his employment with Weirton Steel. Mr. and Mrs. Wood had two more children in 1982 and 1984 and Mrs. Wood continued to be a full-time mother and homemaker.

During the marriage, Mrs. Wood inherited some money from her mother and received a gift from her grandfather of some stock in the Suburban Savings and Loan Association.[2] Mrs. Wood's grandfather also gave her some other stock when she graduated from high school that remains titled in her maiden name. Mrs. Wood placed her inheritance and the proceeds from the sale of the Suburban stock in bank accounts, certificates of deposit or Treasury bills that were jointly titled. In 1980, most of Mrs. Wood's inheritance, about $40,000, was used as the downpayment on the jointly titled marital house. In 1985 Mrs. Wood placed the proceeds from the sale of the Suburban stock, about $29,-000, in a jointly titled Treasury bill. In 1987, the stock proceeds were divided between Mr. and Mrs. Wood. Mrs. Wood maintains that Mr. Wood forced her to divide the stock proceeds by removing about $21,000 from their joint savings account. Mr. Wood acknowledges that he removed the money from the joint savings account but maintains that his share of the stock proceeds, about $15,000, was a gift from Mrs. Wood.[3] Mr. Wood put his half of the stock proceeds in his separate account at the Tin Mill Credit Union and returned the $21,000 to the joint saving account. The record indicates that Mrs. Wood also placed her half in a separate account. The only separate asset of Mr. Wood that appears in the record is his account with the Tin Mill Credit Union.

The Circuit Court of Hancock County awarded Mrs. Wood custody of the children with reasonable visitation rights to Mr. Wood.[4] The circuit court ordered Mr. Wood to pay $720 per month in child support and $500 per month in rehabilitative alimony for a three year period. The court then listed the marital property with evaluations and distributed the marital property. The court's distribution of marital property was unequal in that Mrs. Wood was favored by about $17,000. The circuit court found that the unequal distribution was justified because Mrs. Wood used her inheritance for the downpayment of the marital house. The court also required Mr. Wood to pay part of Mrs. Wood's attorneys' fees and expenses.

On appeal, Mrs. Wood alleges that the circuit court failed to follow the child support guidelines to determine the amount of child support and to classify and evaluate certain property correctly. In his appeal, Mr. Wood alleges that the circuit court erred in ordering an unequal distribution of marital property and in requiring Mr. Wood to pay attorneys' fees in excess of $12,204. Because we find merit in the allegations concerning child support and the classification of property we reverse the order of the circuit court.

I

The child support guidelines must be considered in every case concerning child support. *Gardner, supra; Wyant v. Wyant,* 184 W.Va. 434, 400 S.E.2d 869 (1990); *Bettinger v. Bettinger,* 183 W.Va. 528, 396 S.E.2d 709 (1990); *Holley v. Hol-*

---

1. The August 30, 1989 divorce order was amended by an order entered on March 23, 1990, which explained the unequal distribution of marital property and reclassified certain property as Mr. Wood's separate property.

2. The circuit court's order does not list the parties' separate property and, although the record refers to some separate property, it does not indicate if the separate property discussed in the

record constitutes all of the parties' separate property.

3. Mr. Wood was unable to produce a note from Mrs. Wood that allegedly said that Mrs. Wood wanted to share the stock proceeds equally.

4. Although a family law master conducted a pretrial hearing, the circuit court, at the request of the parties, heard the divorce proceeding.

*ley,* 181 W.Va. 396, 382 S.E.2d 590 (1989). *W.Va.Code,* 48A-2-8(e) [1989], states that the child support "guidelines shall have application to cases of divorce, paternity, actions for support, and modifications thereof." In the Syllabus, in part, *Holley id.,* we said:

> When a family law master or a circuit court enters an order awarding or modifying child support, the amount of the child support shall be in accordance with the established state guidelines, set forth in 6 *W.Va.Code of State Rules* §§ 78-16-1 to 78-16-20 (1988).

*W.Va.Code,* 48A-2-8(a) [1989], requires the director of the child advocate office to establish, by legislative rule, guidelines for the award of child support. 6 *W.Va.Code of State Rules* 78-16-1 to 78-16-20 [1988] is the current version of the rules. *W.Va. Code,* 48A-2-8(a) [1989] states, in pertinent part:

> There shall be a rebuttable presumption, in any proceeding before a family law master or circuit court judge for the award of child support, that the amount of the award which would result from the application of such guidelines is the correct amount of child support to be awarded. A written finding or specific finding on the record that the application of the guidelines would be unjust or inappropriate in a particular case shall be sufficient to rebut the presumption in that case. The guidelines shall not be followed:
>
> (1) When the child support award proposed to be made pursuant to the guidelines has been disclosed to the parties and each party has made a knowing and intelligent waiver of said amount, and the support obligors have entered into an agreement which provides for the custody and support of the child or children of the parties; or
>
> (2) When the child support award proposed to be made pursuant to the guidelines would be contrary to the best inter-

ests of the child or children, or contrary to the best interests of the parties.

The amount of child support determined in accordance with the guidelines is presumptively correct and in order to rebut the presumption, the circuit court or family law master must make a written finding or a specific finding on the record that the application would be unjust or inappropriate. *Gardner, supra* 184 W.Va. at 434, 400 S.E.2d at 275.

In Syllabus Point 2, *Wyant, supra,* we stated:

> In order to facilitate appellate review of child support recommendations or orders, family law masters and/or circuit court judges must include as part of the record the worksheets reflecting the actual calculations which result from the application of the child support guidelines to the facts of a particular case.

*See also Bettinger, supra* 183 W.Va. at 541, 396 S.E.2d at 722.

In the present case, the circuit court, without reference to the child support guidelines, awarded $720 per month in child support. The circuit court noted that the child support award, together with the rehabilitative alimony, was "in an amount sufficient for the family to exist until such time as various assets were liquidated." [5] Mrs. Wood requested a monthly child support of $1,152 based on the child support guidelines using a $2,928 net monthly income for Mr. Wood. Mr. Wood proposed to pay $519 per month based on a $2,434 net monthly income. Mr. Wood's proposal indicated a monthly support award of $987 from which he deducted $468 for the mortgage payment, taxes and insurance. However, Mr. Wood's obligation to pay the mortgage payments and taxes ended as of January 1, 1990. In any case, the child support awarded is substantially less than the amount required by the child support guidelines.

■ On remand, the circuit court should use the child support guidelines found in 6 *W.Va.Code of State Rules* §§ 78-16-1 to

---

**5.** Neither party has appealed the award of rehabilitative alimony. *See Molnar v. Molnar,* 173 W.Va. 200, 314 S.E.2d 73 (1984); *Bettinger, su-* *pra* 183 W.Va. at 541-42, 396 S.E.2d at 722-23, for discussions of rehabilitative alimony.

78–16–20 [1988], to determine the amount of support and include, as part of the record, worksheets reflecting the actual calculations which result from the application of the child support guidelines. We note that the parties disagree on Mr. Wood's net income, the base figure for the child support worksheets. In determining income for child support, the circuit court should include not only commissions, earnings, salaries, wages and any other income due (78 CSR 16–3.1.1 [1988]), but also "[a]ny payment due to a support obligor from a profit-sharing plan, a pension plan...." 78 CSR 16–3.1.2 [1988]. Certain deductions and expenses, such as income tax, taxes withheld from income or the other items specifically allowed in 78 CSR 16–2.1 [1988], are then deducted from the total income to reach the net income for child support worksheet.[6]

We note that the record indicates that Mr. Wood reduced his net monthly income by about $200 by claiming fewer withholding exemptions. Although the income on which a child support award is based can be reduced by the "taxes withheld from income," the amount of tax "shall be based upon the maximum number of withholding exemptions allowable under the applicable tax law." 78 CSR 16–7.1 [1988]. The record also indicates that Mr. Wood may have had several payroll deductions for savings that cannot reduce the net income for child support.

On remand, the circuit court should use the child support guidelines to determine: (1) Mr. Wood's gross income, including income from his profit-sharing plan, (2) Mr. Wood's net income, subtracting only the deductions and expenses specified in the guidelines, and (3) the amount of support. Worksheets reflecting the actual calculation should be included as part of record. The amount of support resulting from the application of the child support guidelines is the correct amount, unless the court, in a written finding or a specific finding on the record, determines that in this particular case the application of the guidelines would be unjust, inappropriate, waived pursuant to the safeguards outlined in *W.Va.Code*, 48A–2–8(a) [1989], or contrary to the best interests of the children or the parties. *W.Va.Code*, 48A–2–8(a) [1989].

## II

On appeal Mrs. Wood contends that the money she received by inheritance or by gift continued to remain her separate property, no matter how titled, and should have been returned to her by the circuit court. Recently in *Whiting, supra,* we discussed equitable distribution under the *W.Va. Code*, 48–2–1, *et seq.* [1990] and rejected the tracing approach requested by Mrs. Wood. *See* Syllabus Point 6, *Whiting.*

In Syllabus Point 1, *Whiting,* we stated:

Equitable distribution under W.Va. Code, 48–2–1, *et seq.,* is a three-step process. The first step is to classify the parties' property as marital or nonmarital. The second step is to value the marital assets. The third step is to divide the marital estate between the parties in accordance with the principles contained in W.Va.Code, 48–2–32.

In Syllabus Point 2, *Whiting,* we required that each step of the equitable distribution procedure be reflected in the findings of fact and conclusions of law in the circuit

---

6. 78 CSR 16–2.1 [1988], states:
   Calculation of net income.—The amount of net income for a support obligor is computed by subtracting from the income of such support obligor the following:
   2.1.1. Income tax ...;
   2.1.2. Taxes withheld from income ...;
   2.1.3. Deductions from income required by law ...;
   2.1.4. Deductions from income required by an employer as a condition of employment ...;
   2.1.5. Deductions from income required by a union as a condition of employment ...;
   2.1.6. Legitimate business expenses ...;
   2.1.7. Deductions for the benefit of children ...; and [sic]
   2.1.8. Payments for the benefit of children.... [sic]
   2.1.9. Indebtedness.... (Cross references omitted.)

court's final order. Mrs. Wood's assignments of error are primarily concerned with the classification and the evaluation of property—the first two steps of the equitable distribution procedures—and one of Mr. Wood's assignments of error is concerned with the unequal distribution of marital property—the third step.

In classifying property as separate or marital, the legislature has indicated a preference for classifying property as marital. In Syllabus Point 3, *Whiting*, we stated:

W.Va.Code, 48–2–1(e)(1) (1986), defining all property acquired during the marriage as marital property except for certain limited categories of property which are considered separate or nonmarital, expresses a marked preference for characterizing the property of the parties to a divorce action as marital property.

*In accord*, Syllabus Point 1, *Koontz v. Koontz*, 183 W.Va. 477, 396 S.E.2d 439 (1990).

In the present case, we note that the circuit court's order does not identify the separate property of the parties except for Mr. Wood's half of the stock proceeds. We noted in Syllabus Point 2, *Rogers v. Rogers*, 182 W.Va. 388, 387 S.E.2d 855 (1989), that:

"W.Va.Code, 48–2–33 [1984], requires a full disclosure of one spouse's financial assets to the other spouse at the time of divorce, and contemplates a meaningful hearing on the subject of equitable distribution of property at which the spouse submitting financial data may be cross-examined concerning the nature, origin and amount of assets." Syl. Pt. 1, *Hamstead v. Hamstead*, 178 W.Va. 23, 357 S.E.2d 216 (1987), *overruled on other grounds, Roig v. Roig*, 178 W.Va. 781, 364 S.E.2d 794 (1988) [sic].

■ The record indicates that in addition to the property classified by the circuit court as marital, Mrs. Wood owned, at least, some stock titled in her maiden name, some property held in trust for the children's education and a bank account containing at least her half of the Suburban stock proceeds. Mr. Wood owned, at least,

his account with the Tin Mill Credit Union. On remand the circuit court's order should list all of the parties' property, and, then, classify each item as marital or nonmarital property.

■ Usually, jointly titled property will be classified as marital property because jointly titled property enjoys "a presumption that the transferring spouse intended to make a gift of the property to the marital estate...." Syllabus Point 4, in part, *Whiting; in accord*, Syllabus Point 1, *Tallman v. Tallman*, 183 W.Va. 477, 396 S.E.2d 453 (1990). Given that Mrs. Wood's inheritance had been placed in jointly titled investments before being used as the downpayment on the jointly titled marital house, we find that the circuit court's classification of the marital house as marital property was justified. In Syllabus Point 6, *Whiting*, we stated:

The source of funds doctrine is ordinarily not available to characterize as separate property that property which has been transferred to joint title during the marriage.

We, therefore, find no merit in Mrs. Wood's assignments of error concerning the classification of the marital house as marital property.

However, this same reasoning calls into question the classification of the proceeds from the sale of the Suburban stock as Mr. Wood's property. According to the record, Mrs. Wood received the stock as a gift and after the stock was sold, Mrs. Wood placed the proceeds in a jointly titled Treasury bill. In 1987, the stock proceeds were divided by the parties and placed in separately titled accounts. On appeal, Mrs. Wood objects to the classification of Mr. Wood's half of the stock proceeds as his separate property.

■ In Syllabus Point 7, *Whiting*, we stated:

Under W.Va.Code, 31A–4–33 (1969), where separate funds are deposited in a joint account in the names of both husband and wife, such funds are presumed to be marital property for the purposes of equitable distribution.

We note that joint titling of property gives rise only to a rebuttable presumption of a gift to the marital estate. "The presumption may be overcome by a showing that the transferring spouse did not intend to transfer the property to joint ownership or was induced to do so by fraud, coercion, duress, or deception. (Footnote and citations omitted)." *Whiting, id.* 183 W.Va. at 459, 396 S.E.2d at 421.

In the present case, Mrs. Wood's deposit of the stock proceeds in a jointly titled Treasury bill gives rise to a rebuttable presumption of a gift to the marital estate and, not a gift to Mr. Wood. The subsequent deposit of the stock proceeds into separately titled bank accounts does not change the property's classification. However, if Mrs. Wood can show that she was coerced into dividing the stock proceeds, the presumption of gift would be overcome. Moreover, if Mr. Wood's removal of $21,000 from the joint account was improper as part of the coercive technique, then these funds become marital property. Although only the classification of Mr. Wood's half of stock proceeds was appealed, Mrs. Wood's half of stock proceeds also became subject to the presumption of marital property when she jointly titled the Treasury bill in which she invested the stock proceeds.

On remand, absent a showing pursuant to the foregoing discussion to overcome the presumption, the circuit court should classify the stock proceeds as marital property subject to equitable distribution.

### III

In her next assignments of error, Mrs. Wood questions the circuit court's evaluations of Mr. Wood's vested pension and the family silver, the second step of the equitable distribution procedure.[7] The record indicates that the evaluations were disputed and that the parties presented conflicting evidence of the value of the pension and the silver.

In Syllabus Point 4, in part, *Cross v. Cross,* 178 W.Va. 563, 363 S.E.2d 449 (1987), we noted that "pension plans [are] as marital property available for equitable distribution...." *See Bettinger, supra* 183 W.Va. at 537–38, 396 S.E.2d at 718–19. In Syllabus Point 2, in part, *Butcher, supra* n. 7, of a military retirement pension, we noted that many courts use a "coverture factor" to determine the noncontributing spouse's share of the pension. "This factor is applied once the initial marital share is determined and consists of the ratio of the number of years the parties have been married while the service person has been in the military to the total number of years of military service."

Although no specific method for distributing a pension is prescribed, Syllabus Point 5 of *Cross supra,* discussed some broad outlines:

> When a court is required to divide vested pension rights that have not yet matured as an incident to the equitable distribution of marital property at divorce, the court should be guided in the selection of a method of division by the desirability of disentangling parties from one another as quickly and cleanly as possible. Consequently, a court should look to the following methods of dividing pension rights in this descending order of preference unless peculiar facts and circumstances dictate otherwise: (1) lump

---

7. Mrs. Wood also questions the evaluation of the marital house at $95,000. Mrs. Wood notes that the house is subject to a mortgage with a balance of $30,862 as of March 1, 1988. However, the circuit court, in his amended order of March 23, 1990, states that Mrs. Wood's share of the marital estate is about $95,000. Given that the value of the other assets awarded to Mrs. Wood was about $30,000, the amended order shows that the circuit court placed a net value on the marital house by subtracting the balance due on the mortgage. *See,* Syllabus Point 3, *LaRue v. LaRue,* 172 W.Va. 158, 304 S.E.2d 312 (1983), *overruled on other grounds, Butcher v. Butcher,* 178 W.Va. 33, 357 S.E.2d 226 (1987).

Mr. Wood, in a cross-assignment of error, asserts that the value of the household goods exceeded $16,000, and that the circuit court erred in valuing the goods at $2,300. In determining the value of the household goods, the circuit court noted that the goods were "used and old." Given the nature of the household goods, we find that the circuit court's valuation of the household goods was not an abuse of discretion.

sum payment through a cash settlement or off-set from other available marital assets; (2) payment over time of the present value of the pension rights at the time of divorce to the non-working spouse; (3) a court order requiring that the non-working spouse share in the benefits on a proportional basis when and if they mature.

*In accord,* Syllabus Point 2, *Langdon v. Langdon,* 182 W.Va. 714, 391 S.E.2d 627 (1990).

■ In the present case, Mr. Wood is still working and the evidence is conflicting whether he can retire after 30 years of service in 1997 with a non-reduced monthly benefit of $784.62. Evidence was also presented that Mr. Wood's pension rights as of March 1, 1988, the date of separation, were to collect $814.73 per month payable at age 65. (Mr. Wood was 39 years old at the date of separation.) Mrs. Wood presented evidence that the value of Mr. Wood's pension, payable after 30 years of service in 1997, was $52,261, which after application of the coverture factor showed marital property valued at $41,636. Mr. Wood presented evidence that the value of his pension, payable at age 65, was $7,656.74. Given the conflicting evidence concerning when Mr. Wood can receive an undiscounted pension, we find that the circuit court did not abuse his discretion in valuing Mr. Wood's pension at $8,500.

■ The evidence valuing the family silver is also conflicting. The record shows that the family had three sets of sterling silver; two sets were inherited by Mrs. Wood and one set was acquired by gift or purchase. In Syllabus Point 3, in part, *LaRue v. LaRue, supra* 172 W.Va. n. 5 at 158, 304 S.E.2d at 312, we indicated that an asset should be valued at its fair market value. In Syllabus Point 3, *Estate of Aul v. Haden,* 154 W.Va. 484, 177 S.E.2d 142 (1970), we stated:

> The market value is the price at which a willing seller will sell and a willing buyer will buy any property, real or personal.

*In accord,* Syllabus Point 1, *Tankersley v. Tankersley,* 182 W.Va. 627, 390 S.E.2d 826 (1990).

Mrs. Wood submitted evidence that the Gorham silver, the silver acquired during the marriage, had an appraised value of $595 from a silver and china exchange. Mrs. Wood testified that the two other sterling sets were of limited value. Mr. Wood submitted evidence showing that the manufacturer's suggested retail price for the Gorham silver alone was $625.00 per place setting for a total value in excess of $5,000. During the marriage the parties had insured all the silver for $11,000. The circuit court valued the silver at $5,000 and given the conflicting evidence, we find that the circuit court did not abuse his discretion in valuing the silver.[8]

## IV

Mr. Wood, in one of his assignments of error, questions the circuit court's unequal division of marital property, the third step of the equitable distribution procedure. The circuit court awarded about $78,000 in marital assets to Mr. Wood and about $95,000 in marital assets to Mrs. Wood, thereby favoring Mrs. Wood by about $17,000. The circuit court said that the unequal distribution was "based upon the history of the marriage, and the separate assets of the Plaintiff which were used to purchase the marital home, said assets totaling well over Fifty Thousand Dollars ($50,000)."

■ *W.Va.Code,* 48–2–32 [1984], provides that, absent a valid agreement, the trial court shall presume that all marital property is to be divided equally. However, *W.Va.Code,* 48–2–32 [1984], then permits the equal division to be altered upon the consideration of several factors, one of which is acquisition of marital property through "[f]unds which are separate property." *W.Va.Code,* 48–2–32(c)(1)(B)

---

8. The record indicates that the circuit court's valuation of marital property was not askew. The record also shows substantial evidence was submitted by each party on the value of each item of marital property.

[1984].[9] In Syllabus Point 1, *Somerville v. Somerville,* 179 W.Va. 386, 369 S.E.2d 459 (1988), we stated:

> In the absence of a valid agreement, the trial court in a divorce case shall presume that all marital property is to be divided equally between the parties, but may alter this distribution, without regard to fault, based on consideration of certain statutorily enumerated factors, including: (1) monetary contributions to marital property such as employment income, other earnings, and funds which were separate property; (2) non-monetary contributions to marital property, such as homemaker services, child care services, labor performed without compensation, labor performed in the actual maintenance or improvement of tangible marital property, or labor performed in the management or investment of assets which are marital property; (3) the effect of the marriage on the income-earning abilities of the parties, such as contributions by either party to the education or training of the other party, or foregoing by either party of employment and education; or (4) conduct by either party that lessened the value of marital property. W.Va.Code § 48-2-32(c) (1986).

*In accord, Whiting, supra* 183 W.Va. at 455, 396 S.E.2d at 417.

In *Somerville,* we recognized that the "statute establishes a presumption of equal division, and sets out in detail what a trial court may consider in order to deviate from an even split of marital property." *Id.* 179 W.Va. at 389, 369 S.E.2d at 462. *W.Va. Code,* 48-2-32(d)(2) [1984], sets forth the additional adjustments that must be considered for an unequal distribution.[10]

**9.** *W.Va.Code,* 48-2-32(c) [1984], provides:

> (c) In the absence of a valid agreement, the court shall presume that all marital property is to be divided equally between the parties, but may alter this distribution, without regard to any attribution of fault to either party which may be alleged or proved in the course of the action, after a consideration of the following:
> (1) The extent to which each party has contributed to the acquisition, preservation and maintenance, or increase in value of marital property by monetary contributions, including, but not limited to:
> (A) Employment income and other earnings; and
> (B) Funds which are separate property.
> (2) To the extent to which each party has contributed to the acquisition, preservation and maintenance, or increase in value of marital property by non-monetary contributions, including, but not limited to:
> (A) Homemaker services;
> (B) Child care services;
> (C) Labor performance without compensation, or for less than the adequate compensation, in a family business or other business entity in which one or both of the parties has an interest;
> (D) Labor performed in the actual maintenance or improvement of tangible marital property; and
> (E) Labor performed in the management or investment of assets which are marital property.
> (3) The extent to which each party expended his or her efforts during the marriage in a manner which limited or decreased such party's income-earning ability or increased the income-earning ability of the other party, including, but not limited to:
> (A) Direct or indirect contributions by either party to the education or training of the other party which has increased the income-earning ability of such other party; and
> (B) Foregoing by either party of employment or other income-earning activity through an understanding of the parties or at the insistence of the other party.
> (4) The extent to which each party, during the marriage, may have conducted himself or herself so as to dissipate or depreciate the value of the marital property of the parties: Provided, That except for a consideration of the economic consequences of conduct as provided for in this subdivision, fault or marital misconduct shall not be considered by the court in determining the property distribution of marital property.

**10.** *W.Va.Code,* 48-2-32(d)(2) [1984], states in pertinent part:

> (d) After considering the factors set forth in subsection (c) of this section, the court shall:
> *     *     *     *     *     *
> (2) Designate the property which constitutes marital property, and define the interest therein to which each party is entitled and the value of their respective interest therein. In the case of an action wherein there is no agreement between the parties and the relief demanded requires the court to consider such factors as are described in subdivisions one, two, three and four, subsection (c) of this section, if a consideration of factors only under said subdivisions one and two would result in an unequal division of marital property, and if an examination of the factors de-

██ W.Va.Code, 48–2–32(f) [1984], provides that the order dividing the property must specify the reasons for the unequal division:

> In any order which divides or transfers the title to any property, determines the ownership or value of any property, designates the specific property to which any party is entitled, or grants any monetary award, the court shall set out in detail its findings of fact and conclusions of law, and the reasons for dividing the property in the manner adopted.

In Syllabus Point 3, *Somerville, id.,* we required:

> An order directing a division of marital property in any way other than equally must make specific reference to factors enumerated in § 48–2–32(c), and the facts in the record that support application of those factors.

██ In the present case, the circuit court gave two justifications for the unequal distribution—the history of the marriage and the use of Mrs. Wood's inheritance as a downpayment on the house. The first reason, the history of the marriage, is too vague to rebut the statutory presumption in favor of equal division. The second reason, the use of Mrs. Wood's inheritance as a downpayment on the house, is one of the factors enumerated in *W.Va.Code,* 48–2–32(c) [1984], and does rebut the presumption in favor of equal division of property.[11] Mr. Wood does not question that Mrs. Wood's inheritance was used as a downpayment on the marital house; rather, Mr. Wood argues that he contributed substantially more with his em-

ployment earnings over the term of the marriage and, thus, should share equally in Mrs. Wood's contribution of her separate property. Mr. Wood's earnings argument fails to credit Mrs. Wood's equally substantial, although non-monetary, contribution in child care and homemaker services. The record indicates that the parties agreed that Mrs. Wood should forego employment in order to provide these services. None of the other factors listed in *W.Va.Code,* 48–2–32(c) [1984], applies.

The circuit court did not abuse its discretion in awarding Mrs. Wood about $17,000 more in marital property because the court's unequal distribution of marital property was the result of "a rational application of the statute to the facts on the record" (*Somerville, supra,* 179 W.Va. at 389, 369 S.E.2d at 462) and the court's reasoning was reflected in the order. We find that Mr. Wood's assignment of error concerning the unequal distribution of marital property is without merit.

### V

In Mr. Wood's final assignment of error, he argues that the circuit court abused its discretion in requiring him to pay a portion of Mrs. Wood's attorneys' fees because the fees were excessive. *W.Va.Code,* 48–2–13(a)(4) [1986], states that "[t]he court may compel either party to pay attorney's fees and court costs reasonably necessary ... to prosecute or defend the action in the trial court." In Syllabus Point 14, *Bettinger, supra,* we stated "[t]he purpose of W.Va.Code, 48–2–13(a)(4) (1986), is to enable a spouse who does not have financial

---

scribed in said subdivisions three and four produce a finding that a party (A) expended his or her efforts during the marriage in a manner which limited or decreased such party's income-earning ability or increased the income-earning ability of the other party, or (B) conducted himself or herself so as to dissipate or depreciate the value of the marital property of the parties, then the court may, in the absence of a fair and just alimony award under the provisions of section fifteen [§ 48–2–15] of this article which adequately takes into account the facts which underlie the factors described in said subdivisions three and four, equitably adjust the definition of the parties' interest in marital property,

increasing the interest in marital property of a party adversely affected by the factors considered under said subdivisions three and four who would otherwise be awarded less than one half of the marital property, to an interest not to exceed one half of the marital property....

11. If the circuit court, on remand, determines that the proceeds from the sale of the Suburban stock are marital property (*see supra* pp. 767–768), the court should consider all the factors tested in *W.Va.Code,* 48–2–32(c) [1984], to determine if a deviation from the presumption in favor of equal division of marital property is justified.

resources to obtain reimbursement for costs and attorney's fees [incurred] [sic] during the course of the litigation." The circuit court required Mr. Wood to pay the following attorneys' fees: (1) his own attorney's fee of $3,713, (2) Mrs. Wood's first attorney's fee of $2,079.25 for representation through the pretrial conference, and (3) two/thirds of Mrs. Wood's second attorney's fee of $9,633.25 for representation through the final hearing. Mrs. Wood also seeks about $5,000 in attorney's fees and costs in connection with her appeal.[12]

The circuit court has considerable discretion in its award of attorneys' fees (*Somerville, supra,* 179 W.Va. at 390, 369 S.E.2d at 463); however, the circuit court must determine the reasonableness of the attorneys' fees based on a number of broad factors which include the time and labor involved, the difficulty of the questions presented, and the customary fee. In Syllabus Point 4, *Aetna Cas. & Surety Co. v. Pitrolo,* 176 W.Va. 190, 342 S.E.2d 156 (1986), we stated:

> Where attorney's fees are sought against a third party, the test of what should be considered a reasonable fee is determined not solely by the fee arrangement between the attorney and his client. The reasonableness of attorney's fees is generally based on broader factors such as: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

In accord, *Burger v. Burger,* 176 W.Va. 416, 345 S.E.2d 18, 20 (1986); *Jones v. Jones,* 176 W.Va. 438, 345 S.E.2d 313, 315 (1986). *See also, Somerville, supra* 179 W.Va. at 390–91, 369 S.E.2d 463–64.

The *Aetna* factors, although similar to the factors used to judge the reasonableness of an attorney's fee between an attorney and his client, are designed to judge the reasonableness of attorneys' fees when payment is sought from a third party. Mrs. Wood's second attorney submitted an itemized statement that noted his times and the expenses. The record shows that the divorce proceeding was polemic and long. The circuit court in awarding Mrs. Wood part of her attorneys' fees noted that the fees were reasonable based on the attorneys' valuable services, the time and labor involved in the preparation and trial, the difficulty of the litigated questions, the ability and experience of the attorneys, and the customary fees for divorce representation.

In the present case, Mrs. Wood is not working, and Mr. Wood earns a substantial income. Moreover, Mrs. Wood has prevailed on her appeal concerning child support, and her attorney is entitled to fees and costs for appellate work. In *Bettinger, supra* 183 W.Va. at 543, 396 S.E.2d at 724–25, we noted that in determining fee awards, "the court should look to the income of the spouses at the time of the final decree." Therefore, we find that the circuit court was correct in awarding part of Mrs. Wood's attorneys' fees and costs and on remand, should award Mrs. Wood the reasonable attorney's fees and costs necessitated by her appeal.

## VI

Because we find merit in the assignments of error concerning child support and the classification of property, the judgment of the circuit court is reversed and

12. Mrs. Wood sought the attorney's fees and costs for her appeal in a motion before the circuit court. Mrs. Wood petitioned this Court to consider the appeal costs after the circuit court awarded Mrs. Wood only part of her costs. In order to expedite the matter, we have considered Mrs. Wood's petition as a motion made in conjunction with her original appeal.

the case is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

NEELY, J., dissents to part II and files herewith his dissenting opinion.

NEELY, Justice, dissenting in part:

The injustice of today's holding is required by the majority's opinion in *Whiting v. Whiting*, 183 W.Va. 451, 396 S.E.2d 413 (1990). Basically, a woman brings money to the marriage; the husband runs off with a younger woman; and, the money that the wife brought to the marriage in the hope of providing security for her children, is used to keep the home wrecker in high style.

Mrs. Wood, a dutiful wife and mother for over seventeen years, was rejected by her husband for a younger woman and a new family. Not satisfied with leaving his first family of three children, ages 11, 5 and 3, Mr. Wood even used the money Mrs. Wood received as a gift from her grandfather to set up his new life. Humiliated, impoverished and held up to obloquy, ridicule and contempt by her husband, Mrs. Wood's sojourn seeking justice collides with our recent holding in *Whiting, id.*, which began redistributing property by eschewing the equitable distribution statute. *See Whiting, id.* (Neely, C.J., dissenting); *Koontz v. Koontz*, 183 W.Va. 477, 396 S.E.2d 439 (1990) (Neely, C.J., dissenting); *Tallman v. Tallman*, 183 W.Va. 491, 396 S.E.2d 453 (1990) (Neely, C.J., dissenting) for my criticism of the majority's rationale and statutory interpretation.

Following *Whiting*'s flawed rationale and statutory interpretation, the majority transforms Mrs. Wood's inheritance from her mother and a gift from her grandfather into unconditional gifts in which Mr. Wood has an equal share. Although I agree that the marital home became marital property, subject to unequal distribution because of Mrs. Wood's contribution of $40,000 *(See Koontz, supra* 183 W.Va. at 483, 396 S.E.2d at 445, for a discussion of the factors that should be considered to determine if property should be considered marital property), the gift of about $30,000 from Mrs. Wood's grandfather should remain Mrs. Wood's separate property. Mr. Wood's physical and monetary intimidation of Mrs. Wood should not be rewarded with any part of her grandfather's gift. Because the majority's holding, based on *Whiting*, unjustly furthers the impoverishment of Mrs. Wood and her children, I dissent from Part II.