413 S.E.2d 911

**Estaline CHARLTON, Plaintiff Below, Appellee,**

v.

**Howard S. CHARLTON, Jr., Defendant Below, Appellant.**

**No. 19763.**

Supreme Court of Appeals of West Virginia.

Submitted May 14, 1991.

Decided Dec. 6, 1991.

Concurring and Dissenting Opinion of Justice Neely Jan. 6, 1992.

Rehearing Denied Feb. 13, 1992.

G. Patrick Stanton, Jr., Stanton & Stanton, Fairmont, for appellee.

David R. Janes, Tharp, Liotta & Janes, Fairmont, for appellant.

MILLER, Chief Justice:

This is an appeal from a final order of the Circuit Court of Marion County which granted the parties, Howard S. Charlton, Jr., and Estaline Charlton, a divorce. The primary question on appeal is whether the circuit court erred in ruling that funds inherited by each of the parties during the marriage and placed in jointly titled investments were the separate property of the respective parties. We conclude that the funds were not marital property, and we affirm the judgment of the circuit court.

I.

The facts are not in any substantial dispute. The parties were married on November 23, 1956, and thereafter lived in Fairmont, Marion County. It appears Mr. Charlton was employed as a teacher and/or school administrator, while Mrs. Charlton did not work outside the home. The parties had two children, both of whom were

emancipated at the time of the proceedings below.

During the marriage, Mrs. Charlton inherited $139,331 from her mother and an additional $21,000 from her husband's aunt. Mr. Charlton inherited $40,000 from his parents and an additional $7,000 from his aunt. All of these funds were placed in investment accounts in the joint names of the parties and were managed by Mr. Charlton. It does not appear that the corpus of these investments was used for marital purposes, but some of the income from the investment accounts was used for marital living expenses.

On February 4, 1988, the parties separated. Mrs. Charlton subsequently instituted divorce proceedings on grounds of adultery, cruelty, and desertion in the Circuit Court of Marion County. The matter was referred to a family law master.

On June 29, 1988, the family law master issued his decision recommending that Mrs. Charlton be granted a divorce on the ground of adultery. The law master apparently concluded that treating the investment accounts as marital property would unjustly enrich Mr. Charlton. The law master found Mr. Charlton to be the party solely at fault for the dissolution of the marriage. He recommended that each party withdraw from the joint investment accounts the amount he or she inherited during the marriage.

By order entered September 11, 1989, the circuit court adopted the family law master's findings and conclusions. The court awarded Mrs. Charlton $160,331 from the investment accounts as her separate property and awarded Mr. Charlton $47,000 as his separate property from the same source. The remainder of the parties' assets were ordered equally distributed between them. By order dated November 9, 1990, the circuit court refused Mr. Charlton's motion for reconsideration.

## II.

### A.

■ In reaching his conclusion that Mrs. Charlton's inheritance was her separate property, the family law master relied upon the principles of unjust enrichment, which we outlined in *Patterson v. Patterson,* 167 W.Va. 1, 277 S.E.2d 709 (1981), *overruled on other grounds, LaRue v. LaRue,* 172 W.Va. 158, 304 S.E.2d 312, 41 A.L.R.4th 445 (1983). The factual basis for the claim of unjust enrichment was that the husband was at fault for the breakup of the marriage. In *Patterson* we impressed a constructive trust in favor of the wife on property acquired during the marriage partially by the wife's contributions, but titled solely in the name of the husband. In the course of our discussion, we recognized that the presumption of gift between husband and wife under W.Va.Code, 48–3–10 (1931), would not defeat such a constructive trust where the husband would be unjustly enriched.[1]

We note, however, that *Patterson* was decided before the adoption in 1984 of our equitable distribution statute, W.Va.Code, 48–2–32. W.Va.Code, 48–2–32(c), states:

"In the absence of a valid agreement, the court shall presume that all marital property is to be divided equally between the parties, but may alter this distribution, *without regard to any attribution of fault to either party which may be alleged or proved in the course of the action, after a consideration of the following .[factors]....*" (Emphasis added.)

---

1. The family law master quoted the following passage from *Roig v. Roig,* 178 W.Va. 781, 785, 364 S.E.2d 794, 798 (1987), which in turn quoted from *Patterson,* 167 W.Va. at 11–12, 277 S.E.2d at 716:

"'... The court cannot be blind to the obvious fact that most married persons do not contemplate divorce throughout the entire course of a marriage, and that transfers of property between spouses is usually intended for the joint benefit of both. While we must retain the presumption of gift in order to avoid difficult third-party claims (since spouses usually do intend to confer the benefit of property on their other spouse in the event of their death), the presumption of gift is probably best rebutted in a suit between spouses by a clear showing of unjust enrichment. Most people do not intend unjustly to enrich the other man.'"

This provision goes on to identify a number of economic factors, including homemaker and child care services, that can be considered in determining whether an unequal distribution of the marital property is warranted. W.Va.Code, 48–2–32(c)(1)–(3). The factors listed in W.Va.Code, 48–2–32(c)(4), also permit an unequal distribution to the extent one of the parties has been found to have dissipated or depreciated the value of marital assets. This section specifies that "except for a consideration of the economic consequences [of such dissipation or depreciation of assets], fault or marital misconduct shall not be considered by the court in determining the proper distribution of marital property." [2]

These statutory provisions remove fault in the conduct of the parties as a factor in determining the appropriate division of marital property. This is consistent with the overall statutory structure regarding the equitable distribution of marital property between husband and wife. The purpose of the equitable distribution statute is to achieve a proper economic distribution of marital assets. Consequently, the Legislature chose to focus solely on economic factors, excluding consideration of fault as a factor in altering the distribution.

We are reinforced in this conclusion by the contrasting language in W.Va.Code, 48–2–15(i) (1986), which specifically authorized a court making an award of alimony to consider the fault of either party:

"In determining whether alimony is to be awarded, or in determining the amount of alimony, if any, to be awarded under the provisions of this section, *the court shall consider and compare the fault or misconduct of either or both of the parties and the effect of such fault or misconduct as a contributing factor to the deterioration of the marital relationship.*" [3] (Emphasis added).

Even before the adoption of this provision, we had indicated that fault or misconduct could be considered in awarding alimony. In those instances where there were traditional fault grounds for the divorce, we awarded alimony to the wife if she was the innocent party. *See State ex rel. Cecil v. Knapp*, 143 W.Va. 896, 105 S.E.2d 569 (1958). With the advent of no-fault grounds for divorce, we have held, based on statutory language, that inequitable conduct which caused the dissolution of the marriage can be considered as a factor in the alimony consideration. Under W.Va. Code, 48–2–4(a)(7) (1981), which recognizes living separate and apart without cohabitation for a year as a ground for divorce, "the court may inquire into the question of who is the party at fault and may award alimony according to the right of the matter[.]" Based on this language, we held in Syllabus Point 1 of *Peremba v. Peremba*, 172 W.Va. 293, 304 S.E.2d 880 (1983):

"When alimony is sought under *W.Va. Code*, 48–2–4(a)(7), the court may consider substantial inequitable conduct on the part of the party seeking alimony as one factor in its decision. Substantial inequitable conduct is conduct which the trier

2. W.Va.Code, 48–2–32(c)(4), provides, in its entirety, for consideration of

"[t]he extent to which each party, during the marriage, may have conducted himself or herself so as to dissipate or depreciate the value of the marital property of the parties: Provided, That except for a consideration of the economic consequences of conduct as provided for in this subdivision, fault or marital misconduct shall not be considered by the court in determining the proper distribution of marital property."

3. The remaining text of W.Va.Code, 48–2–15(i) (1986), is as follows:

"However, alimony shall not be awarded in any case where both parties prove grounds

for divorce and are denied a divorce, nor shall an award of alimony under the provisions of this section be ordered which directs the payment of alimony to a party determined to be at fault, when, as a grounds granting the divorce, such party is determined by the court:

"(1) To have committed adultery; or

"(2) To have been convicted for the commission of a crime which is a felony, subsequent to the marriage, if such conviction has become final; or

"(3) To have actually abandoned or deserted his or her spouse for six months."

Amendments to W.Va.Code, 48–2–15 in 1990 and 1991 did not substantially alter these provisions. *See* 1991 W.Va.Acts ch. 45; 1990 W.Va. Acts ch. 40.

of fact may infer caused the dissolution of the marriage."

Likewise, W.Va.Code, 48-2-4(a)(10) (1981), which specifies irreconcilable differences as a ground for divorce, provides that the court may make orders as to alimony which are "just and equitable." In the Syllabus of *Haynes v. Haynes*, 164 W.Va. 426, 264 S.E.2d 474 (1980), we stated:

> "*W.Va.Code*, 48-2-4(a)(10) [1977] which provides for a consensual divorce based upon irreconcilable differences allows the court to make a 'just and equitable' award with regard to alimony, and since divorce on this ground is consensual, it is not necessary to find fault or inequitable conduct on the part of the spouse to be charged with an alimony award, although *consideration may be given by the trial court to fault or inequitable conduct as one of many factors to be considered in determining what is 'just and equitable.'*"[4] (Emphasis added).

From the foregoing discussion, we believe it is clear that in enacting our equitable distribution statute, the Legislature did not intend fault to be considered as a factor in determining the division of marital property. However, the Legislature did designate marital fault as a factor to be considered in awarding alimony under the provisions of W.Va.Code, 48-2-15(i).

### B.

■ Mr. Charlton contends that the circuit court erred in not characterizing the investment accounts as marital property and dividing them in accordance with our equitable distribution statute. Mrs. Charlton counters that the accounts were separate property under W.Va.Code, 48-2-1(f)(4) (1986), which refers to "[p]roperty acquired by a party during marriage by gift, bequest, devise, descent or distribution[.]"

■ Mr. Charlton argues this case is controlled by *Whiting v. Whiting*, 183 W.Va. 451, 396 S.E.2d 413 (1990), where we discussed at some length the statutory concepts of marital and separate property. We also discussed the consequences of titling one spouse's separate property in the joint names of both spouses and stated in Syllabus Point 4:

> "Where, during the course of the marriage, one spouse transfers title to his or her separate property into the joint names of both spouses, a presumption that the transferring spouse intended to make a gift of the property to the marital estate is consistent with the principles underlying our equitable distribution statute."

In *Whiting*, we recognized that joint titling of separate property gives rise only to a rebuttable presumption of a gift to the marital estate, and we outlined some factors that would overcome the presumption:

> "The presumption may be overcome by a showing that the transferring spouse did not intend to transfer the property to joint ownership or was induced to do so by fraud, coercion, duress, or deception. *See Bonnell v. Bonnell*, [117 Wis.2d 241, 344 N.W.2d 123 (1984)]; *Trattles v. Trattles*, 126 Wis.2d 219, 376 N.W.2d 379 (App.1985)." 183 W.Va. at 459, 396 S.E.2d at 421. (Footnote omitted).

A coercive transfer of separate property to a joint account was considered in *Wood v. Wood*, 184 W.Va. 744, 403 S.E.2d 761 (1991). There, the wife claimed that certain bank stock which she had inherited was placed into a Treasury bill jointly titled with her husband at his insistence. The record on appeal was not sufficiently developed to make a final determination of this

---

**4.** Our cases have recognized that even though a party is not at fault, alimony can still be awarded against such party. In Syllabus Point 1 of *F.C. v. I.V.C.*, 171 W.Va. 458, 300 S.E.2d 99 (1982), we stated: "Alimony may be awarded under W.Va.Code, 48-2-4(a)(7) against a 'faultless' party if 'principles of justice' so require, considering the financial needs of the parties and other factors listed in Code, 48-2-16 [ (1969) ]." We emphasized that the "[c]oncrete financial realities of the parties must be a court's primary inquiry in any alimony award." 171 W.Va. at 460, 300 S.E.2d at 101. This observation would certainly retain its validity under our present alimony statute, W.Va.Code, 48-2-16 (1984).

issue. We did, however, recognize that "if Mrs. Wood can show that she was coerced into dividing the stock proceeds, the presumption of gift [to the marital estate] would be overcome." 184 W.Va. at 752, 403 S.E.2d at 769.

In the domestic relations area, we have recognized that there exists a fiduciary relationship between husband and wife with regard to dealing with each other's property. For example, in *Marshall v. Marshall,* 166 W.Va. 304, 273 S.E.2d 360 (1980), the husband and wife were separated. The wife, who was depressed over the separation, sought a reconciliation. The husband refused to agree to a reconciliation unless she turned over her stocks and interest in real property to him. This she did, but about one year later, the parties again separated, and a divorce action was filed.

The husband claimed that the wife had made a bona fide gift to him of the property. The trial court agreed, but we reversed, holding that there existed a confidential relationship which required the transaction to be scrutinized to see if it was fair and executed in good faith. We summarized these principles in the Syllabus of *Marshall:*

"1. One who receives property from another with whom he has a confidential relationship has the burden of showing that the transfer was fair and made with utmost good faith.

"2. The relationship between husband and wife is one of confidence and trust.

"3. Where persons occupy a fiduciary or confidential relationship the lack of independent advice on the part of the person who claims to be disadvantaged by the transaction may be a significant factor in a court's evaluation of the overall bona fides of the transaction."

While *Marshall* was decided before our equitable distribution statute was enacted, other courts have applied these principles to equitable distribution issues. For example, in *Burgess v. Burgess,* 710 P.2d 417 (Alaska 1985), the husband induced the wife to sign a quitclaim deed conveying to him her interest in the marital home, their only substantial asset. The wife was told that the transfer was necessary to protect against a possible lawsuit and that she would ultimately receive her one-half interest. The trial court held the quitclaim deed to be valid. The Alaska Supreme Court reversed this holding in a rather summary fashion: "The existence of the quitclaim deed does not change this result because the deed is fraudulent and the product of undue influence. In marital relationships a transaction in which one spouse gains an advantage over the other is presumptively fraudulent." 710 P.2d at 421. (Footnote omitted; citation omitted).

California, a community property state, followed much the same rule in *In re Marriage of Saslow,* 40 Cal.3d 848, 221 Cal. Rptr. 546, 710 P.2d 346 (1985). The wife induced her husband to set up a $30,000 trust as her separate property. The Supreme Court of California found that the husband was not competent to enter into the trust agreement and set the transaction aside:

"However, transactions between spouses are 'subject to the general rules which control the actions of persons occupying confidential relations to each other....' (Civ.Code, § 5103.) To support a finding of undue influence, '[t]he evidence, in addition to a showing of marriage relationship, must also show such unfairness of the transaction as will tend to establish that the wrongful spouse made use of the confidence reposed for the purpose of gaining an unreasonable advantage over the mate.' (*Snyder v. Snyder* (1951) 102 Cal.App.2d 489, 492 [227 P.2d 847])[.]" 40 Cal.3d at 863–864, 221 Cal. Rptr. at 553, 710 P.2d at 354.

*See also Chrestman v. Chrestman,* 4 Ark. App. 281, 630 S.W.2d 60 (1982); *In re Marriage of Rink,* 136 Ill.App.3d 252, 91 Ill. Dec. 34, 483 N.E.2d 316 (1985). *See generally* 41 Am.Jur.2d *Husband & Wife* § 270 (1968); 41 C.J.S. *Husband & Wife* § 87 (1991).

In the present case, there are several critical factors that bring this rule into play. First, Mr. Charlton was the primary financial planner in the family. He handled the investments and prepared the in-

come tax returns. Mrs. Charlton acknowledged her ignorance in this area and that she was willing to entrust her funds to her husband, who placed them in joint investment accounts. Second, the principal of Mrs. Charlton's inherited money was not spent for marital purposes. Some of the income was expended, but Mrs. Charlton maintained she was led to believe that the principal would be left intact. The evidence supports this conclusion because the principal sum of the inheritance was not spent, but remained in the investment accounts.

We are not confronted with a joint account in which separate property has been placed and used for marital purposes. As we stated in *Whiting*, we decline to trace the source of funds in a joint account where that joint account has been utilized as a repository for both marital and nonmarital property. Moreover, the investment accounts total more than Mrs. Charlton's inheritance and include an amount sufficient to cover Mr. Charlton's separate inheritance of $47,000.

Thus, we conclude that where a spouse inherits property and entrusts the investment of that property to the other spouse, who is more financially knowledgeable, and the property itself is not used for marital purposes, the fact that the property is titled in the joint names of the spouses will not convert it to marital property. Under this rule, the evidence adduced in the proceedings below was sufficient to overcome the presumption that Mrs. Charlton made a gift to the marital estate of her separate inheritance.

### III.

The other assignments of error raised by Mr. Charlton may be disposed of in a more summary fashion.

---

5. Mr. Charlton also contends that he should not be required to pay additional alimony in the form of medical expenses incurred by Mrs. Charlton. This issue is basically subsumed by the petition for modification which we have permitted Mr. Charlton to pursue in the circuit

### A.

First, Mr. Charlton asserts that the trial court's award of $1,500 in alimony is excessive. At the time of the final order, Mr. Charlton was employed as superintendent of the Hancock County schools at a yearly salary of $56,000 per year. Mrs. Charlton, who apparently did not work outside the home during the marriage, was unemployed. Mr. Charlton's particular complaint is that the trial court failed to take into account the income received by Mrs. Charlton from the interest on the investment accounts awarded to her in the property division.

We are advised that Mr. Charlton has recently filed a petition for modification in the circuit court based on the termination of his employment in Hancock County. We granted his motion for leave to proceed on the modification on July 17, 1991. Consequently, because the alimony issue is before the circuit court, we decline to address it further.[5]

### B.

Error is also asserted in the trial court's ruling requiring Mr. Charlton to pay his wife $2,500 in attorney's fees and $1,500 in expert witness fees. As we have already noted, Mrs. Charlton is not employed. Her situation is analogous to that in *Bettinger v. Bettinger*, 183 W.Va. 528, 396 S.E.2d 709 (1990), where we concluded in Syllabus Points 14 and 15 as follows:

"14. The purpose of W.Va.Code, 48–2–13(a)(4) (1986), is to enable a spouse who does not have financial resources to obtain reimbursement for costs and attorney's fees during the course of the litigation.

"15. Reimbursement for reasonable expert witness fees is permissible under

---

court. Consequently, we decline to discuss it here. However, we do direct the parties' attention to W.Va.Code, 48–2–15(b)(3), which outlines in some detail how health care needs are to be handled in a divorce.

similar financial considerations as those used in awarding attorney's fees."

We find no error on this point.

## C.

 The final claim raised by Mr. Charlton is that the court ordered personal property to be distributed to third parties. It appears that certain articles, such as the children's bedroom furniture, were awarded to the parties' children. A review of the record fails to disclose that Mr. Charlton contested this distribution in his petition for review filed in the circuit court. In Syllabus Point 2 of *Duquesne Light Co. v. State Tax Department*, 174 W.Va. 506, 327 S.E.2d 683 (1984), *cert. denied*, 471 U.S. 1029, 105 S.Ct. 2040, 85 L.Ed.2d 322 (1985), we stated:

> " 'This Court will not pass on a nonjurisdictional question which has not been decided by the trial court in the first instance.' Syllabus Point 2, *Sands v. Security Trust Co.*, 143 W.Va. 522, 102 S.E.2d 733 (1958)."

Consequently, we need not discuss this point.

## IV.

For the foregoing reasons, the judgment of the Circuit Court of Marion County is affirmed, but in view of the modification petition filed by Mr. Charlton in the circuit court, this case is remanded for further proceedings consistent with this opinion.[6]

Affirmed and remanded.

NEELY, Justice, concurring in part and dissenting in part:

Why did the majority wait until December 6 to file an opinion in a case heard May 14, when on average it takes this Court just over two months to decide a case?[1] Perhaps the majority is uncomfortable with the leaps in logic required to suggest (with a straight face, no less) that *W.Va.Code,* 48–2–1(e) and (f) [1986], *Whiting v. Whiting,* 183 W.Va. 451, 396 S.E.2d 413 (1990), and the case at hand are consistent with one another.

Thus, the majority have written this opinion following the third golden rule of trial lawyers.[2] I will try to cut through the underbrush and explain briefly what the majority has done. As I said in my dissent in *Whiting,* *Whiting* overturned *W.Va. Code,* 48–2–1(e) and (f) [1986], and redefined marital property in West Virginia. *Whiting* 183 W.Va. at 463, 396 S.E.2d at 425 (Neely, J. dissenting). In doing so, *Whiting* created the problem presented in this case. Under *Whiting,* a spouse who brings property into a marriage and (in an effort to promote marital harmony) places that property into jointly titled real estate or a jointly titled account, loses half of that property forever, even if his wife runs off with a drummer whilst he works two jobs to raise and educate the children. *Whiting* was an easy case in which to make such a decision because the spouse who lost half of the property was the man. But, as the old cliché goes, easy cases make bad law.

Now the majority is faced with a less sympathetic case in which the losing party under *Whiting* would be the woman—oh my God, we wanted it shaggy, but not that shaggy! Instead of applying *Whiting* as it was written or, better yet, admitting that *Whiting* was wrong, the majority creates a 50% exception to *Whiting* into which they

---

**6.** Had the author of the dissent taken the time to look in this Court's record on *Charlton,* he would have discovered that, after repeated requests from our Clerk's office, the transcript of the testimony taken below was filed here on October 1, 1991. From a review of the dissent, the author appears not overly concerned with the facts. The real complaint in the dissent is that no one will even join him in his byzantine analysis, much less join with him to overturn *Whiting v. Whiting,* 183 W.Va. 451, 396 S.E.2d 413 (1990).

**1.** A minute review of the record in this case had about as much to do with today's decision as the Nuremberg record had to do with our decision to hang Hermann Göring (*see,* maj. op. note 6).

**2.** The three golden rules of trial lawyers are:
(1) If the facts are against you, argue the law;
(2) If the law is against you, argue the facts; and,
(3) If both the facts and the law are against you, confuse the hell out of the court.
The third rule, when required to stand alone, is occasionally restated as: "If you can't dazzle them with brilliance, baffle them with bull____."

can push all women who may title property in their husband's name. Thus, like a child standing over a broken cookie jar who still refuses to admit he should not have been reaching for the Oreos, the majority still refuse to recognize the error they committed in *Whiting* despite the "broken glass" that must now be picked up surreptitiously.

If the majority had said today that because they believe women are so disadvantaged in our society and so naturally incompetent, they will torture our law to temper the wind for the shorn *lady* lambs, they would at least have stood squarely on the rock of history and I would not be invited to ridicule. After all, in our landmark case of *Moore v. Mustoe*, 47 W.Va. 549, 35 S.E. 871 (1900) we said:

> Woman has always been a favorite with equity, and it always throws it[s] willing arms around her to protect her from the importunity and duress of her impecunious husbands.

*Moore*, 47 W.Va. at 552, 35 S.E. at 873.

And (to show how history repeats itself) the great feminist legal philosopher, Catharine MacKinnon wrote very recently:

> Women can know society because consciousness is part of it, *not because of any capacity to stand outside it or oneself.* This stance locates the position of consciousness, from which one knows, in the standpoint and time frame of that attempting to be known. The question is not whether objective reality exists but whether that concept accesses the is-ness of the world. *Feminist epistemology* asserts that the social process of being a woman is on some level the same process as that by which woman's consciousness becomes aware of itself as such and of its world. Mind and world, as a matter of social reality, are taken as interpenetrated. Knowledge is neither a copy nor a miscopy of reality, neither representative nor misrepresentative as the scientific model would have it, but a response to living in it. *Truth is in a sense a collective experience of truth, in which "knowledge" is assimilated to consciousness, a consciousness that exists as a reality in the world, not merely in the head.* This epistemology does not at all deny that a relation exists between thought and some reality other than thought, or between human activity (mental or otherwise) and the products of that activity. *Rather, it redefines the epistemological issue from being the scientific one, the relation between knowledge and objective reality, to a problem of the relation of consciousness to social being.* [Emphasis added.]

C. MacKinnon, *Toward a Feminist Theory of the State*, 98–99 (Cambridge, Mass.: Harv.U.Press 1989). Professor MacKinnon then, in her discussion of feminist consciousness raising, argues that women both naturally and appropriately view the world from a perspective other than objective reality. At least, I think that is what she is saying.[3] Ms. MacKinnon acknowledges, then, such truisms as women don't think about managing money the same way that men do—the exact conclusion reached by our majority today and reached unanimously by this Court in 1900 in *Moore v. Mustoe.*

So, instead of being blunt about this Court's determination to make sure that women get whatever gold mine survives a nasty divorce while the men get the shaft, the majority continue to pretend that they are "interpreting" a sex neutral standard from *W.Va.Code*, 48–2–1(e) and (f) [1986]. They are not!

As I said in my *Whiting* dissent, my disagreement with the majority is based on my belief in the integral role of the family in our society. Both husbands and wives should be encouraged to do everything they can to make marriages work. *Whiting* encourages just the opposite. It invites spouses to play a game of "yours" *versus* "mine" rather than treating everything as "ours."

---

**3.** Ms. MacKinnon undoubtedly has some very intelligent things to say, but when I read her, I have the same overwhelming sense of deprivation that I experience reading Roberto Unger. Indeed, it is a tragedy that fate has denied these great luminaries the opportunity to write in their native languages.

The very act of pigeonholing property— his, hers, ours—undermines the marriage. Sedulously protecting separate property at every transfer, renewal, reinvestment or exchange will weaken a marriage by emphasizing and reemphasizing the viability of the divorce option.

*Whiting*, 183 W.Va. at 464, 396 S.E.2d at 426 (Neely, J. dissenting).

I understand the short-term incentives behind *Whiting*'s attempt at wealth redistribution; indeed, in the 1970's I understood the short-term incentives behind wholesale nationalization in Third World countries. But thoughtless wealth redistribution didn't work in Uganda, Zaire and Mozambique, and it won't work in domestic relations. In the short-term those who are poor receive an infusion of money. In the long term, however, the *wealth producers* find ways to protect their wealth from transfer or they quit producing wealth. Problems like this are what law is all about. Sophisticated legal systems look to their society's long term success, which is why we all have greater confidence investing in America than we do investing in Uganda.

The professional class of lawyers and doctors, possessing surpassing arrogance as they do, believe that they have a monopoly of knowledge about how the law or the human body works. Yet that's not at all true; indeed, long ago I found that my clients often knew more about the peculiar law that applied to their businesses than I did. And, as regards the problem of joint ownership created by *Whiting*, next to sex, the single most interesting subject of conversation for all mankind is money. Thus, even ordinary blue collar workers have received the hot news by now about the enormous jeopardy to which a person subjects himself (or herself?) when separate property is titled in joint names.

In West Virginia, wealthy spouses will now make strong attempts to segregate their assets. In the long term, this can only be damaging to the family. The legislature understood this when it enacted *W.Va.Code*, 48–2–1(e) and (f) [1986],[4] but

4. *W.Va.Code*, 48–2–1(e) and (f) [1986], provides:

(e) "Marital property" means:

(1) All property and earnings acquired by either spouse during a marriage, including every valuable right and interest, corporeal or incorporeal, tangible or intangible, real or personal, regardless of the form of ownership, whether legal or beneficial, whether individually held, held in trust by a third party, or whether held by the parties to the marriage in some form of co-ownership such as joint tenancy or tenancy in common, joint tenancy with the right of survivorship, or any other form of shared ownership recognized in other jurisdictions without this state, *except that marital property shall not include separate property as defined in subsection (f) of this section;* and

(2) The amount of any increase in value in the separate property of either of the parties to a marriage, which increase results from (A) an expenditure of funds which are marital property, including an expenditure of such funds which reduces indebtedness against separate property, extinguishes liens, or otherwise increases the net value of separate property, or (B) work performed by either or both of the parties during the marriage.

The definitions of "marital property" contained in this subsection and "separate property" contained in subsection (f) of this section shall have no application outside of the provisions of this article, and the common law as to the ownership of the respective property and earnings of a husband and wife, as altered by the provisions of article three [§ 48–3–1 et seq.] of this chapter and other provisions of this code, are not abrogated by implication or otherwise, except as expressly provided for by the provisions of this article as such provisions are applied in actions brought under this article or for the enforcement of rights under this article.

(f) "Separate property" means:

(1) Property acquired by a person before marriage; or

(2) Property acquired by a person during marriage in exchange for separate property which was acquired before the marriage; or

(3) Property acquired by a person during marriage, but excluded from treatment as marital property by a valid agreement of the parties entered into before or during the marriage; or

(4) Property acquired by a party during marriage by gift, bequest, devise, descent or distribution; or

(5) Property acquired by a party during a marriage but after the separation of the parties and before the granting of a divorce, annulment or decree of separate maintenance; and

(6) Any increase in the value of separate property as defined in subdivision (1), (2), (3), (4) or (5) of this subsection which is due to inflation or to a change in market value resulting from conditions outside the control of the parties. [Emphasis added.]

the majority continue to ignore a statute enacted by the legislature and the dictates of common sense.

*Whiting v. Whiting* must be overruled!